THOMAS J. SPELLACY, INSURANCE COMMISSIONER, ET AL. *v.* THE AMERICAN LIFE INSURANCE ASSOCIATION

BALDWIN, O'SULLIVAN, WYNNE, DALY and KING, Js.

348

Argued April 3—decided May 1, 1957

*Louis Weinstein,* assistant attorney general, with whom, on the brief, was *John J. Bracken,* attorney general, for the plaintiffs.

*James J. A. Daly* and *Daniel E. Brennan, Jr.,* with whom were *John P. Evans* and, on the brief, *Thomas F. Seymour,* for the defendant.

BALDWIN, J. This is an action for a declaratory judgment and an injunction, brought by the insurance commissioner and the bank commissioner of this state to restrain the defendant, a domestic fraternal benefit society, from issuing to its members residing in Connecticut and seven other states, where it is duly licensed to operate, a proposed certificate, or policy, of insurance known as a variable endowment contract. The case has been reserved upon an agreed statement of facts for advice upon certain questions.[1]

---

[1] "1. Is the word 'endowment,' as used in Section 6244 of the General Statutes and/or in No. 456 of the Special Acts of 1947, limited to certificates which, upon their issuance, set forth the amount

The defendant was first incorporated by a special act of the General Assembly in 1899. It began as the Hungarian Sick Benefit Societies Confederation with the purpose of assisting its members by the payment of benefits in the event of illness or bodily injury and by defraying funeral expenses and paying the family or estate of a deceased member benefits not exceeding $600. 13 Spec. Laws 158, No. 175. In 1911, the benefits payable on death were increased to $1000. 16 Spec. Laws 132, No. 150. By another amendment in 1925, the defendant, the name of which had been changed to the Hungarian Aid Association of America, was authorized to establish and maintain an institution which would be available to members who by reason of illness or age had become incapable of earning a living, or to their widows and dependent children. The defendant was also authorized at that time to establish subordinate branches of its society in any town or city of this state and, subject to such by-laws, rules and regulations as the defendant should determine, in any

of money to be paid the insured at maturity as a fixed number of dollars?

"2. Is the defendant's Variable Endowment Certificate . . . an endowment certificate within the meaning of said Section 6244 and/or No. 456?

"3. Is the defendant authorized to issue such Variable Endowment Certificates under its charter and the Connecticut statutes governing fraternal benefit societies?

"4. Is the plaintiff Insurance Commissioner empowered to prohibit the defendant's issuance of said Variable Endowment Certificates to its members residing in states other than Connecticut?

"5. Is the plaintiff Insurance Commissioner empowered to prohibit the defendant's issuance of said Variable Endowment Certificates to its members residing in Connecticut?

"6. Is the defendant an insurance company within the meaning of Section 2771d of the 1955 Supplement to the General Statutes?

"7. Is the defendant's issuance of such Variable Endowment Certificate subject to the provisions of Chapter 288 of the General Statutes?"

other state or country. 19 Spec. Laws 769, No. 259. In 1931, the General Assembly provided by special act that the defendant could pay the families, relatives or estates of its deceased members "such sum or sums of money, upon such certificates and terms, and designation by its members while living, as the by-laws of said corporation may prescribe." 21 Spec. Laws 123. In 1936, the name of the defendant was changed to the American Sick Benefit and Life Insurance Association. A further amendment in 1947, now in force, empowers the defendant "to pay its members, while living, endowments, annuities or other benefits." 25 Spec. Laws 615, No. 456. The name of the defendant was again changed in 1948 to the American Life Insurance Association.

The defendant is duly licensed by the insurance commissioner of this state to carry on its affairs as a fraternal benefit society. It also has branches in New Jersey, Pennsylvania, Michigan, Ohio, West Virginia, Indiana and Illinois, under licenses issued by the insurance commissioners of those states. It is subject to chapter 299 of the General Statutes, relating to fraternal benefit societies. That chapter includes § 6244, which empowers fraternal benefit societies to issue to their members "term, life, endowment and annuity certificates and combinations thereof." The defendant has filed with the insurance commissioner forms of certificates providing for fixed endowments, refunds of premiums and guaranteed paid-up additions, all of which are insurance agreements similar to those issued by other organizations with the approval of the commissioner.

The defendant informed the insurance commissioner that it proposed to issue to its members in this state and elsewhere a so-called variable endowment contract, and on January 6, 1956, it filed with

him a proposed form of contract. This proposed certificate, commonly referred to as an insurance policy, is a combination life insurance and endowment contract with conventional provisions giving protection for a term of years against the contingencies of ill health and death. The policy further provides for a "variable endowment" payable to the insured at the end of the term stated in the policy. The term in the specimen policy is forty years. The conventional benefits are payable in cash, and, in the event of death, the sum specified is $10,000. The variable endowment is payable in 10,000 "units." It is this feature of the policy which precipitates the present controversy and calls for a discussion of the nature of these units.

Each unit represents a specific amount invested in the variable endowment fund. A specific portion of each annual premium paid by an insured is allocated by the defendant to this fund, the corpus of which, pursuant to the terms of the policy, is invested and reinvested by the defendant in common stocks, equity-type securities, and other lawful investments. The avowed purpose of the variable endowment fund is to afford the insured, upon the expiration of the term stated in the policy, not payment in depreciated dollars but the advantage of payment in the form of a participation in a fund appreciated, it is hoped, by investment and savings. In common parlance, the fund represents an effort to hedge against inflation.

In the view which we take of this case, it is unnecessary to rehearse in complete detail all the provisions contained in the policy for the establishment and management of the variable endowment fund. Some of the particular provisions will be discussed hereinafter in connection with our examination of

the applicable law. At this point, it suffices to say that the provisions appear to have been carefully considered in the interest of the insured and in the effort to provide a purportedly safe investment out of which to pay the endowment set up in the policy. The crucial question is whether the charter of the defendant and the general statutes relating to fraternal benefit societies empower the defendant to issue a policy providing this type of endowment.

The charter of the defendant empowers it "to pay its members, while living, endowments, annuities or other benefits." 25 Spec. Laws 615, No. 456. General Statutes § 6244 authorizes fraternal benefit societies to issue to their members "term, life, endowment and annuity certificates and combinations thereof." The immediate inquiry is whether the word "endowment" as used in the defendant's charter and in § 6244 comprehends the variable endowment which the defendant proposes to issue to its members. In seeking the answer to this question, we shall first consider some general principles controlling the construction of corporate charters. Generally speaking, legislative grants of power to corporations, when susceptible of more than one interpretation, are to be construed favorably to the state. *Hartford Bridge Co.* v. *Union Ferry Co.,* 29 Conn. 210, 222. The power of any insurance company to issue policies of insurance is limited to that especially given by, or necessarily inferred from, the statutes under which it was organized and operates. 18 Appleman, Insurance Law & Practice, § 10002. Fraternal benefit societies like the defendant are creatures of statute and can exercise only the powers which are expressed or clearly implied in their charters or in legislation controlling their conduct. 18 id. § 10171. Legislation concerning insurance com-

panies and fraternal benefit societies is adopted primarily for the protection of the public and must be construed with that purpose in mind. 44 C.J.S. 520.

Against this background of general principles, we next consider specifically what is meant by the word "endowment" as used in § 6244 and in the defendant's charter. The word is one of common usage in insurance circles. An endowment policy is one whereby "the insurer agrees to pay to the insured a certain sum at the end of a certain period, or if he dies before the expiration of the term fixed, to pay the amount to a person designated as beneficiary." 1 Cooley, Insurance (2d Ed.) p. 32; *Central States Life Ins. Co.* v. *Morris,* 202 Ark. 969, 973, 155 S.W.2d 333. The defendant argues that its proposed policy does provide for the payment of a fixed amount, albeit that amount is measured, not in terms of dollars, as the death benefit is, but in terms of "units." These units concededly have a fluctuating value and represent aliquot portions of the variable endowment fund in which a part of each premium has been invested. Stated briefly, the endowment rights are in the form of shares in an investment trust. It is true that the settlement of the endowment will be in cash, unless an option for a different mode of settlement is exercised. The dollar amount of the settlement, however, is fixed by the value of the units as shares in the variable endowment fund, which, in our example, could be substantially more, or substantially less, than $10,000.

As stated hereinbefore, the word "endowment" is one of long and general usage. Countless thousands of policies providing for insurance and endowments payable in specified sums of money have been issued through the years by innumerable companies. En-

dowment insurance has been defined as promising "to pay a stated amount to designated beneficiaries if the insured should die within a stipulated time or to the insured himself if he survive." Webster's New International Dictionary (2d Ed.), "life insurance *or* assurance." That the payment of a specified amount in dollars is the generally accepted concept of an insurance company's liability on an endowment policy finds overwhelming support in the definition of an endowment by text writers and the courts. 1 Appleman, Insurance Law & Practice, § 4; 1 Couch, Insurance, § 25; 1 Joyce, Insurance (2d Ed.) p. 99; 1 Richards, Insurance (5th Ed.) § 27; *Central States Life Ins. Co.* v. *Morris,* 202 Ark. 969, 973, 155 S.W.2d 333; *Union Central Life Ins. Co.* v. *Woods,* 11 Ind. App. 335, 341, 37 N.E. 180; *State ex rel. Clapp* v. *Federal Investment Co.,* 48 Minn. 110, 111, 50 N.W. 1028; *McKee* v. *Columbus Mutual Life Ins. Co.,* 171 Okla. 250, 252, 42 P.2d 831; *Silen* v. *Silen,* 44 Wash. 2d 884, 887, 271 P.2d 674; 44 C.J.S. 487, § 27(d). Words in statutes are to be construed according to the commonly approved usage of the language, and those which have acquired peculiar and appropriate meanings in the law must be construed and understood accordingly. General Statutes § 8890; *Seery* v. *Fitzpatrick,* 79 Conn. 562, 564, 65 A. 964. When the legislature used the word "endowment" in the defendant's charter and in § 6244, it employed a word generally used in insurance parlance as involving an undertaking to make payment of a specified sum of money.

The proposed policy includes a "variable annuity option." Upon the exercise of this option, the defendant agrees to grant a variable annuity certificate, or policy, for any one of five types of annuity pay-

ments. The variable annuity policy is to be issued "for such total number of variable annuity units, payable monthly or as may be agreed, as the cash redemption value of the accumulated variable endowment units . . . shall purchase at the initial conversion value of the Variable Annuity Units in effect when the [policy] is issued." A minimum is fixed at 1000 variable annuity units. The endowment policy recites that "[t]he objective of the contract for Variable Annuity Certificate will be the preservation and increase of the relative purchasing power of the initial dollar value of the annuity units." In line with this objective, the dollar return from the annuity units would fluctuate with the value and the amount of return from the corpus of the fund from which the annuities are paid. We have said that an annuity is a yearly payment of a certain sum of money granted to another in fee, or for life, or for a term of years, charging the person of the grantor only. It is a stated sum, payable annually. *Strakosch* v. *Connecticut Trust & Safe Deposit Co.,* 96 Conn. 471, 491, 114 A. 660; *Bartlett* v. *Slater,* 53 Conn. 102, 107, 22 A. 678; *Commissioner* v. *Hale,* 315 Mass. 556, 558, 53 N.E.2d 675. Insurancewise, it has the same meaning. 1 Appleman, Insurance Law & Practice, § 81; 1 Couch, Insurance, p. 38. The policy to be issued under the annuity option would provide for the payment, not of a fixed amount of money, but of an uncertain sum, which is quite different from the legal concept of the word "annuity." Here again, the legislature employed a term generally used and understood, and it must be assumed that it did so intending that annuity payments should be in definite sums of money.

Section 2851d of the 1955 Cumulative Supplement provides: "Each certificate issued by any [fraternal

benefit] society shall specify the amount of benefit provided thereby . . . ." The phrase "amount of benefit" implies, in the light of the purpose of such legislation, an amount in dollars readily ascertainable by the insured or at least comprehensible to him. This provision of the law is applicable to the amounts of both the endowment and the annuity. As to the latter, it is true that the defendant, like any insurance company, can pay to its insureds money in the form of dividends. These dividends, like the return on an investment in the stock of a corporation, may vary in amount. An annuity, however, is very different from a dividend, which, in the insurance world, is "the return to policy-holders of funds derived from their premiums not used and not needed for the purpose for which they were paid." *Fuller* v. *Metropolitan Life Ins. Co.,* 70 Conn. 647, 666, 41 A. 4; 3 Appleman, Insurance Law & Practice, § 1954. The sale of an interest in an investment fund from which the purchaser derives a periodic return because of his participation in the fund is a perfectly legitimate, and in recent years an increasingly common, venture. It is totally different from insurance with endowment and annuity provisions, because the element of protection which is the very nature of insurance is lacking. See *Fawcett* v. *Iron Hall,* 64 Conn. 170, 205, 206, 207, 29 A. 614. True, in a mutual benefit society such as the defendant the profit motive is absent, but in the proposed variable endowment contract the speculative feature remains a paramount purpose.

The defendant claims that §§ 6250, 6261 and 6263 of the General Statutes empower it to contract with its members for endowment policies which provide that the amount of the endowment will be measured by the monetary consideration allocated to the fund out of which the payments are to be made plus or

minus the actual earnings or losses resulting from the operation of the fund. These sections deal with the types of funds which may be established by a fraternal benefit society to enable it to meet all its obligations. They are not concerned with the type of policy which a society may issue, which is the basic question in the instant case. They are not independent authorizations but are supplemental to the provisions of the defendant's charter and § 6244 of the General Statutes and must be considered with them.

The defendant argues that an undertaking to pay an endowment or annuity in dollars does not necessarily guarantee the payment of a certain and fixed sum, because the purchasing power of the dollar has depreciated in recent years and there is no assurance that the value of the endowment as contemplated by the insured at the time of the issuance of the policy will remain constant. This is true. There is a real distinction, however, between the general depreciation in the value of the dollar and the depreciation which may occur in the value of units in a variable endowment or annuity fund such as is contemplated in the present case. The former is due to widespread economic factors affecting all alike. The latter may be due to such factors, reflected in a general decline in the market value of securities rather than in the depreciation of the dollar, but it may also be due to possible poor judgment or lack of skill in the management of the investments in the particular fund. When an endowment or annuity is payable in a specified number of dollars, an insured runs the risk of depreciation of the dollar. When it is payable in variable endowment or annuity units, he runs the risk of depreciation of the unit, measured in dollars, including the added risk that it may be depreciated

by reason of factors not traceable to general economic conditions. The defendant escapes this type of risk and transfers it to the insured. The matter involves so basic a change in insurance procedure that the defendant's argument is one more properly addressed to the legislature than to the court. We hold that neither the defendant's charter nor § 6244 empowers it to issue the proposed variable endowment contract.

The questions propounded raise the issue whether, if the defendant is prohibited from issuing the proposed variable endowment contract to its members in Connecticut, it is also prohibited from issuing the contract to its members in the other states. No question has been raised about the power of the insurance commissioner to seek an injunction in this case, nor could that power be successfully challenged. He is the proper officer to act in this matter on the state's behalf. *Allyn* v. *Hull,* 140 Conn. 222, 226, 99 A.2d 128; *American Casualty Ins. & Security Co.* v. *Fyler,* 60 Conn. 448, 460, 22 A. 494; 10 Fletcher, Corporations (Perm. Ed.) § 4855. He has, however, no extraterritorial powers except as the action which he is authorized to take in this state may affect the validity of corporate acts beyond its borders. The powers of a corporation are determined by the laws under which it is incorporated and is authorized to act. *Canada Southern Ry. Co.* v. *Gebhard,* 109 U.S. 527, 537, 3 S. Ct. 363, 27 L. Ed. 1020; see *Union & New Haven Trust Co.* v. *Watrous,* 109 Conn. 268, 276, 146 A. 727; *First Title & Securities Co.* v. *United States Gypsum Co.,* 211 Iowa 1019, 1026; 233 N.W. 137; 17 Fletcher, op. cit., p. 106. The interpretation placed by the courts of a state upon its statute law, public and private, is generally accepted by the courts of other jurisdictions. *First*

*Federal Savings & Loan Assn.* v. *Connelly,* 142 Conn. 483, 489, 115 A.2d 455; *Daury* v. *Ferraro,* 108 Conn. 386, 399, 143 A. 630; 14 Am. Jur. 302, § 89. Therefore, it having been determined that the proposed variable endowment contract is not one within the power of the defendant to issue, the insurance commissioner can prevent its issuance not only in this state but in all others.

To the first question in the reservation we answer "Yes"; to the second and third questions we answer "No"; to the fourth and fifth questions we answer "Yes"; the result which we have reached with respect to the first five questions makes it unnecessary to answer questions 6 and 7.

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.