SECURITIES AND EXCHANGE COM-
MISSION, Appellant,

v.

UNITED BENEFIT LIFE INSURANCE
COMPANY, Appellee.

No. 19382.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 19, 1965.

Decided March 10, 1966.

Mr. Walter P. North, Associate Gen. Counsel, with whom Mr. Philip A. Loomis, Jr., Gen. Counsel, S. E. C., was on the brief, for appellant. Mr. Robert L. McCloskey, Atty., S. E. C., also entered an appearance for appellant.

Mr. Daniel J. McCauley, Jr., Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. M. Joseph Stoutenburgh, Washington, D. C., was on the brief, for appellee.

Mr. Joseph B. Levin, Washington, D. C., with whom Mr. Marc A. White, Washington, D. C., was on the brief, for Investment Company Institute and National Ass'n of Securities Dealers, Inc., as, amici curiae, urging reversal.

Before BAZELON, *Chief Judge,* EDGERTON, *Senior Circuit Judge,* and BURGER, *Circuit Judge.*

BAZELON, *Chief Judge:*

The basic issue in this case is whether the Flexible Fund Annuity (FFA) issued by appellee United Benefit Life Insurance Company (United) is subject to

federal regulation under the Securities Act of 1933 and the Investment Company Act of 1940. The Securities and Exchange Commission sought injunctive relief in the District Court against United on the grounds that the FFA contract is an unregistered "security" within the definition of the 1933 Act [1] and that the separate account, which United created in connection with the FFA, is an unregistered "investment company" within the meaning of the 1940 Act.[2] The District Court ruled that the FFA was an "insurance product," exempted from regulation under both Acts.[3] This appeal followed.

The FFA contract is framed as a deferred annuity policy. The policyholder agrees to pay United a specified gross premium periodically—i.e., once a month—for a certain number of years. These premiums, less deductions for expenses, are accumulated by United during this deferred period in a separate account, known as Flexible Fund A. Unlike a conventional annuity, however, United does not guarantee to accumulate net premiums at a specified rate of interest. Instead, United promises that the annuitant will be credited with a proportionate share of the profits which have resulted from the investment and reinvestment of the money in the Flexible Fund. In addition, United guarantees that at least 100 per cent of the net premiums will stand to the account of the annuitant throughout the deferred period if the investment experience of the Fund is unprofitable.[4] Cash surrender values equal to the accumulated value or minimum guarantee of the policy, and death benefits equal to the accumulated value or total gross premiums paid, whichever are higher, are also provided during the deferred period. At the maturity date specified in the policy, the annuitant is given the option of withdrawing the accumulated value of his policy in cash or of applying this value to a fixed annuity at rates prescribed in the initial contract. These rates are based upon a guaranteed $2\frac{1}{2}\%$ per cent interest factor during the pay-out period, and once United begins payments to the annuitant the value of his policy is fixed; the profits made by the Fund are no longer accumulated in favor of the annuitant.

The result in this case, as both parties recognize, is controlled by the Supreme Court's recent decision in the *VALIC* case.[5] At issue in *VALIC* was a variable annuity policy which did not guarantee a fixed monetary value for the annuity either in the deferred or pay-out periods; its value at all times depended directly upon the investment experience of a pool of securities, and the annuitant was, in effect, a direct participant in that pool. The question was whether this variable annuity was a "security" within the meaning of the 1933 and 1940 Acts or a "contract of insurance," which would be exempt from the Acts by their own terms, as well as by the provisions of the McCarran-Ferguson Act.[6] The majority of the Court found that the issuing company had assumed the mor-

1. 48 Stat. 74 (1933), as amended, 15 U.S.C. § 77b(1) (1964).

2. 54 Stat. 797 (1940) as amended, 15 U.S.C. § 80a–3 (1964).

3. The Securities Act of 1933 contains an exemption for,
   "Any insurance or endowment policy or annuity contract or optional annuity contract * * *." 15 U.S.C. § 77c (a) (8) (1964).
   The District Court did not explicitly address itself to the Investment Company Act, but implicit in its decision is a finding that the Flexible Fund fell within the exemption of that Act for "any bank or insurance company * * *." 15 U.S.C. § 80a–3(c) (3) (1964).

4. This assumes that the deferred period is ten years or longer. If the deferred period is less than ten years, United only guarantees a percentage of the net premiums, ranging from 50 per cent in the first year to 90 per cent in the ninth year.

5. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959).

6. 59 Stat. 33 (1945), as amended, 15 U.S.C. § 1011 (1964).

tality and expense risks usually associated with insurance. However, since the company did not guarantee a fixed monetary value for the policy, it placed "all the investment risks on the annuitant, none on the company." Because the concept of insurance required "some investment risk-taking on the part of the company," the Court concluded that the variable annuity was not "insurance" and hence was subject to federal regulation.

In a concurring opinion, Mr. Justice Brennan explained in greater detail why the factor of investment risk was determinative. He pointed out that the purpose of the federal regulatory scheme had only minimal relevance to conventional insurance and annuity policies, which assumed the investment risk by creating fixed monetary obligations, and that state regulation of reserves and solvency offered truly meaningful protection to the policyholder. Mr. Justice Brennan reasoned that since the variable annuity in *VALIC* did not include substantial fixed dollar guarantees, federal regulation was quite relevant to the variable annuity contract, while state regulation was not; he therefore found the contract a "security," subject to the 1933 and 1940 Acts. In sum, both the majority and concurring opinions implicitly held that a company must bear a substantial part of the investment risk associated with the contract, as well as the mortality and expense risks, in order to qualify its products as "insurance."

In most respects the FFA and the traditional deferred annuity are identical. Both guarantee interest on principal during the pay-out period; both assume all mortality and expense risks throughout the term of the contract; and both provide death benefits and cash surrender values.[7] The only meaningful difference between the FFA and the conventional deferred annuity is that the FFA does not guarantee interest on the accumulation of net premiums during the deferred period, but instead promises 100 per cent of net premiums plus a share in any profits made by the investment and reinvestment of the money in the Flexible Fund.

The SEC would minimize the similarities between the FFA and the deferred annuity first by asserting jurisdiction only over the deferred portion of the contract. The SEC then contends that the "investment risk" referred to in *VALIC* is the risk of not earning interest on the principal sum invested and that a contract is not "insurance" unless interest as well as principal is guaranteed. In support of this position the SEC emphasizes the extent to which the fortunes of the annuitant depend upon the investment policies and experience of the Fund and argues that the court should not treat the minimum guarantee of 100 per cent of net premiums as a substantial assumption of investment risk because it is extremely unlikely that the Fund's investment experience will be so disastrous as to call the guarantee into effect.

We note initially that adoption of the SEC's position that interest must be guaranteed during the deferred, as well as the pay-out, period would restrict annuity policies essentially to their current form. This result would contravene the explicit warning of the Supreme Court in *VALIC* where all nine Justices counseled against freezing the concept of annuity into a single pattern and argued that development and growth of insurance concepts should be allowed.[8] We also think that the SEC has misconceived the concept of "investment risk," as it is used in *VALIC,* by focusing on the likelihood of United's having to make good on its guarantee. Presumably no insurance company will undertake a guaran-

---

7. For a general description of the conventional deferred annuity see, *e. g.,* Huebner & Black, Life Insurance 104–16, 311–22, 329–30, 332–34 (6th ed. 1964) [hereinafter cited as Huebner & Black]; Mehr & Osler, Modern Life Insurance 79–103, 531–47 (3rd ed. 1961) [hereinafter cited as Mehr & Osler].

8. 359 U.S. at 68, 71, 75–76, 100–101, 79 S. Ct. at 620, 621, 624–625, 637.

tee in any policy if there is a substantial possibility that it will have to resort to surplus to satisfy that obligation.[9] Instead of denoting the company's risk, we think the concept refers to the annuitant's risk of losing money—principal, as well as anticipated earnings on principal —over the course of the investment period. By guaranteeing principal—100 per cent of net premiums—United has assumed a substantial part of this risk during the deferred period of the contract. Were the annuitant to invest on his own in the stock market, or even in so-called "safe" securities like bonds and mortgages, he would not have this guarantee, and his principal would never be absolutely secure.[10]

Finally, we reject the SEC's basic premise that the contract should be fragmented and the risk during the deferred period only should be considered. United's guarantee of principal and 2½ per cent interest during the pay-out period is a very substantial assumption of investment risk, which should not be ignored. Indeed, the *VALIC* opinions, as well as common sense, indicate that a challenged policy should be viewed as a whole in order to test its amenability to federal regulation. All told, United has assumed not only a substantial part, but by far the major part, of the investment risk over the duration of the entire policy.[11] The obligations of United under the FFA, unlike those of the variable annuity, are stated, in large part, in terms of guaranteed dollar amounts; there is a substantial and meaningful "floor" to the FFA policy. We therefore conclude that the FFA is an "insurance" contract and as such beyond the scope of federal regulation under the 1933 and 1940 Acts.[12] The judgment of the District Court is

Affirmed.

9. If an insurance company guarantees 2 per cent or 3 per cent interest, it does *so only after it has made extensive studies* which demonstrate to its satisfaction that there is no substantial probability that the funds associated with the policy will fail to earn this amount over the duration of the contract. See, *e. g.*, HUEBNER & BLACK 296–300, 346–47, 388–90; MEHR & OSLER 590–93, 599.

10. The SEC also urges that so long as the contract allows the annuitant any direct participation in the investment experience of the company, the policy must be subject to the federal regulatory scheme. This argument ignores completely the language and logic of *VALIC*, which contemplated a test based on the substantiality of the investment risk assumed by the company. See 359 U.S. at 71–73, 85, 89, 79 S.Ct. at 621, 623, 629, 631. A related objection to this argument is the effect that it would have upon the participating annuity, which the SEC concedes is exempt from federal regulation. The participating annuity clearly provides, and is intended to provide, that the annuitant will participate directly, even if minimally, in the investment experience of the compa-

ny. See, *e. g.*, HUEBNER & BLACK 387–98; MEHR & OSLER 598–605; 614–20.

11. The substantiality of the investment risk which United assumes in the FFA is even more apparent when that policy is compared with a participating annuity. In the latter, the interest factor during the deferred period is deliberately set quite low so as to assure dividends; and while dividends are in theory discretionary, in practical terms they must be declared regularly or the company will lose too much business. In effect, a participating policy promises, in part, a smaller interest guarantee in return for the opportunity to share in greater interest when that is earned. See, *e. g.*, HUEBNER & BLACK 387–402; MEHR & OSLER 598–605, 614–20. For this reason the FFA can be regarded as an extension or development of the concept of participating insurance.

12. The SEC finally contends that the case should be reversed because of the trial court's rulings on admission of evidence court's rulings on admission of evidence. Whether or not these rulings were correct, we don't think they affected "substantial justice." FED.R.CIV.P. 61.