SECURITIES AND EXCHANGE COMMISSION *v.*
UNITED BENEFIT LIFE INSURANCE CO.

No. 428.   Argued April 10, 1967.—Decided May 22, 1967.

*Solicitor General Marshall* argued the cause for petitioner. With him on the brief were *Robert S. Rifkind, Philip A. Loomis, Jr., Solomon Freedman, Walter P. North* and *Jacob H. Stillman.*

*Daniel J. McCauley, Jr.,* argued the cause for respondent. With him on the brief were *Morris L. Weisberg* and *Donald F. Evans.*

*Joseph B. Levin, Robert L. Augenblick* and *Marc A. White* filed a brief for the Investment Company Institute et al., as *amici curiae,* urging reversal.

Mr. Justice Harlan delivered the opinion of the Court.

This action was initiated by the Securities and Exchange Commission to enjoin respondent (United) from offering its "Flexible Fund Annuity" contract without undertaking the registration required by § 5 of the Securities Act of 1933,[1] and to compel United to register the "Flexible Fund" itself as an "investment company" pursuant to § 8 of the Investment Company Act of 1940.[2]

The "Flexible Fund Annuity" is a deferred, or optional, annuity plan having characteristics somewhat similar to those of the variable annuities this Court held, in *S. E. C. v. Variable Annuity Life Insurance Co.*, 359 U. S. 65 (*VALIC*), to be subject to the Securities Act. Like the variable annuity, it is a recent effort to meet the challenge of inflation by allowing the purchaser to reap the benefits of a professional investment program while at the same time gaining the security of an insurance annuity.[3] There are, however, significant differences between the "Flexible Fund" contract and the variable annuity, and it is claimed that these differences suffice to bring the "Flexible Fund" contract within the "optional annuity contract" exemption of § 3 (a)(8) of the Securities Act[4] and to bring the "Flexible Fund" itself within

---

[1] 48 Stat. 77, 15 U. S. C. § 77e.

[2] 54 Stat. 803, 15 U. S. C. § 80a–8.

[3] United's sales brochure describes the plan as featuring "a method of accumulation modernized to keep pace with today's living . . . and a chance to share in the growth of the country's economy." At the same time it is claimed that the plan "combines this new method of accumulation with the time-tested advantages of a lifetime annuity . . . a savings and accumulation plan that guarantees a lifetime income at maturity."

[4] 48 Stat. 76, 15 U. S. C. § 77c (a)(8) exempts from the operation of the Securities Act "Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commis-

the "insurance company" exemption of § 3 (c)(3) of the Investment Company Act, 54 Stat. 798, 15 U. S. C. § 80a–3 (c)(3).

The purchaser of a "Flexible Fund" annuity agrees to pay a fixed monthly premium for a number of years before a specified maturity date. That premium, less a deduction for expenses (the net premium), is placed in a "Flexible Fund" account which United maintains separately from its other funds, pursuant to Nebraska law. Neb. Rev. Stat. § 44–310.06 (1963 Cum. Supp.). United undertakes to invest the "Flexible Fund" with the object of producing capital gains as well as an interest return, and the major part of the fund is invested in common stocks. The purchaser, at all times before maturity, is entitled to his proportionate share of the total fund and may withdraw all or part of this interest. The purchaser is also entitled to an alternative cash value measured by a percentage of his net premiums which gradually increases from 50% of that sum in the first year to 100% after 10 years. Other features, common to conventional annuity contracts, are also incorporated in United's plan.[5]

At maturity, the purchaser may elect to receive the cash value of his policy, measured either by his interest in the fund or by the net premium guarantee, whichever is larger. He may also choose to convert his interest into a life annuity under conditions specified in the

sioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."

[5] For example a refund of premiums is provided in case of death before maturity. Deferred periods of varying duration may be chosen, and the purchaser may elect to turn his cash value into an annuity at a date before specified maturity. Standard incontestability clauses and assignment clauses are incorporated into the contract. The contract at issue in *S. E. C.* v. *Variable Annuity Life Insurance Co.*, 359 U. S. 65, also had some ancillary features common to all standard annuity contracts. The Court did not find them determinative. *Id.*, at 73, n. 15.

"Flexible Fund" contract. These conditions relate future benefits to dollars available at maturity so the dollar benefits to be received will vary with the cash value at maturity. However, the net premium guarantee is, because of this conversion system, also a guarantee that a certain amount of fixed-amount payment life annuity will be available at maturity.

After maturity the policyholder has no further interest in the "Flexible Fund." He has either received the value of his interest in cash, or converted to a fixed-payment annuity in which case his interest has been transferred from the "Flexible Fund" to the general reserves of the company, and mingled, on equal terms per dollar of cash value, with the interests of holders of conventional deferred annuities.

Because of the termination of interest in the "Flexible Fund" at maturity, the SEC contended that the portion of the "Flexible Fund" contract which dealt with the pre-maturity period was separable and a "security," within the meaning of the Securities Act. It was agreed that the provisions dealing with the operation of the fixed-payment annuity were purely conventional insurance provisions, and thus beyond the purview of the SEC. The District Court held that the guarantee of a fixed-payment annuity of a substantial amount gave the entire contract the character of insurance. The Court of Appeals for the District of Columbia Circuit affirmed. 123 U. S. App. D. C. 305, 359 F. 2d 619. That court rejected "the SEC's basic premise that the contract should be fragmented and the risk during the deferred period only should be considered." Considering the contract as a whole, it found, as the SEC had urged, that this Court's decision in *VALIC, supra,* was controlling. But it read that decision to hold only "that a company must bear a substantial part of the investment risk associated with the contract . . . in order to qualify its

products as 'insurance.'" 123 U. S. App. D. C., at 308, 359 F. 2d, at 622. Because of the net premium guarantee and the conversion to payments which included an interest element during the fixed-payment period, the court concluded that the "Flexible Fund" met this test. Because of the importance of the issue, and the need for clarifying the implications of the *VALIC* decision, we granted certiorari, 385 U. S. 918. We now reverse for reasons given below.

First, we do not agree with the Court of Appeals that the "Flexible Fund" contract must be characterized in its entirety. Two entirely distinct promises are included in the contract and their operation is separated at a fixed point in time. In selling a deferred annuity contract of any type, United must first decide what amount of annuity payment is to be allowed for each dollar paid into the annuity fund at maturity.[6] In making that calculation United must analyze expected mortality, interest, and expenses of administration. The outcome of that calculation is shown in the conversion table which is included in the "Flexible Fund" contract.

The second problem United must face in a deferred annuity is to determine what amount will be available for the annuity fund at maturity. In a conventional annuity where a fixed amount of benefits is stipulated it is essential that the premiums both cover expenses and produce a fund sufficient to support the promised benefits.[7] In fixing the necessary premium mortality

---

[6] Annuities may indeed be purchased for a single premium, and it is the basic single-premium calculation which controls the benefits of all deferred plans. See Johnson, The Variable Annuity—Insurance, Investment, or Both?, 48 Geo. L. J. 641, 655; Mehr & Osler, Modern Life Insurance 79–102 (3d ed. 1961).

[7] For such a calculation the return-of-premium provision can be considered to be a form of term insurance provided by the company and included within the expense arrangements.

experience is a subordinate factor and the planning problem is to decide what interest and expense rates may be expected. There is some shifting of risk from policyholder to insurer, but no pooling of risks among policyholders. In other words, the insurer is acting, in a role similar to that of a savings institution, and state regulation is adjusted to this role.[8] The policyholder has no direct interest in the fund [9] and the insurer has a dollar target to meet.

The "Flexible Fund" program completely reverses the role of the insurer during the accumulation period. Instead of promising to the policyholder an accumulation to a fixed amount of savings at interest, the insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience. The insurer is obligated to produce no more than the guaranteed minimum at maturity, and this amount is substantially less than that guaranteed by the same premiums in a conventional deferred annuity contract.[10] The fixed-payment benefits are adjusted to reflect the number of dollars available, as opposed to the conventional annuity where the amount available is planned to reflect the promised benefits.

The insurer may plan to meet the minimum guarantee by split funding—that is, treating part of the net pre-

---

[8] See Huebner & Black, Life Insurance 518–524 (5th ed. 1958).

[9] See Johnson, *supra*, n. 6, at 673.

[10] The table below compares the cash values of the "Flexible Fund" contracts with those of United's standard deferred annuities:

| Years | Paid in | Flexible Fund guarantee | Respondent's standard deferred annuity |
|---|---|---|---|
| 1 | 1,200 | 300 | 624 |
| 5 | 6,000 | 3,461 | 5,460 |
| 10 | 12,000 | 10,374 | 12,504 |
| 20 | 24,000 | 21,774 | 30,792 |
| 30 | 36,000 | 33,174 | 54,828 |
| 40 | 48,000 | 44,574 | 87,156 |

mium as it would a premium under a conventional deferred annuity contract with a cash value at maturity equal to the minimum guarantee and investing only the remainder [11]—or by setting the minimum low enough that the risk of not being able to meet it through investment is insignificant. The latter is the course United seems to have pursued.[12] In either case the guarantee cannot be said to integrate the pre-maturity operation into the post-maturity benefit scheme. United could as easily attach a "Flexible Fund" option to a deferred life insurance contract or any other benefit which could otherwise be provided by a single payment. And the annuity portion of the contract could be offered independently of the "Flexible Fund." [13] We therefore conclude that we must assess independently the operation of the "Flexible Fund" contract during the deferred period to determine whether that separable portion of the contract falls within the class of those exempted by Congress from the requirements of the Securities Act, and, if not, whether the contract constitutes a "security" within § 2 of that Act, 48 Stat. 74, 15 U. S. C. § 77b.

The provisions to be examined are less difficult of classification than the ones presented to us in *VALIC*. There it was held that the entire plan under which benefits continued to fluctuate with the fortunes of the fund

[11] See O'Brien, Static Dollars? Dynamic Dollars? Why Not Have Both!, Apr. 25, 1960 Investment Dealers' Digest (Mutual Fund Supplement) 56. Cf. *Spellacy* v. *American Life Ins. Assn.*, 144 Conn. 346, 131 A. 2d 834.

[12] The record shows that United set its guarantee by analyzing the performance of common stocks during the first half of the 20th century and adjusting the guarantee so that it would not have become operable under any prior conditions.

[13] Advisers Fund, Inc., a mutual fund, sells shares on an installment plan and simultaneously guarantees that an affiliated insurance company will allow the proceeds on redemption to be applied to the purchase of an annuity at specified conversion rates.

after maturity, was not a contract of insurance within the § 3 (a) exemption. A pooling of mortality risk was operative during the payment period, and the contract was one of insurance under state law, but a majority of this Court held that "the meaning of 'insurance' . . . under these Federal Acts is a federal question," 359 U. S., at 69, and "that the concept of 'insurance' involves some investment risk-taking on the part of the company." *Id.*, at 71. The argument "that the existence of adequate state regulation was the basis for the exemption .[the position taken by four dissenting Justices] . . . was conclusively rejected . . . in VALIC for the reason that variable annuities are 'securities' and involve considerations of investment not present in the conventional contract of insurance." *Prudential Insurance Co. v. S. E. C.*, 326 F. 2d 383, 388. It was implied in the majority opinion in *VALIC* and made explicit by the two concurring Justices,[14] that the exemption was to be considered a congressional declaration "that there then was a form of 'investment' known as insurance (including 'annuity contracts') which did not present very squarely the sort of problems that the Securities Act . . . [was] devised to deal with, and which were, in many details, subject to a form of state regulation of a sort which made the federal regulation even less relevant." *VALIC*, at 75 (opinion of BRENNAN, J.). In considering *VALIC* to have turned solely on the absence of any substantial investment risk-taking on the part of the insurer there, we think that the Court of Appeals in the present case viewed that decision too narrowly.

Approaching the accumulation portion of this contract, in this light, we have little difficulty in concluding that it does not fall within the insurance exemption of

---

[14] MR. JUSTICE BRENNAN and MR. JUSTICE STEWART joined in a concurring opinion written by MR. JUSTICE BRENNAN and also joined in the opinion of the Court.

§ 3 (a) of the Securities Act. "Flexible Fund" arrangements require special modifications of state law, and are considered to appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of "growth" through sound investment management.[15] And while the guarantee of cash value based on net premiums reduces substantially the investment risk of the contract holder, the assumption of an investment risk cannot by itself create an insurance provision under the federal definition. *Helvering* v. *Le Gierse,* 312 U. S. 531, 542. The basic difference between a contract which to some degree is insured and a contract of insurance must be recognized.

We find it equally clear that the accumulation provisions constitute an "investment contract" within the terms of § 2 of the Securities Act. As the Court said in *S. E. C.* v. *Joiner Leasing Corp.*, 320 U. S. 344, 352–353, "The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." Contracts such as the "Flexible Fund" offer important competition to mutual funds, see Johnson, The Variable Annuity—Insurance, Investment, or Both?, 48 Geo. L. J. 641, and are pitched to the same consumer interest in growth through professionally managed investment. It seems eminently fair that a purchaser of such a plan be afforded the same advantages of disclosure which inure to a mutual fund purchaser under § 5 of the Securities Act. "At the state level the Uniform Securities Act makes

---

[15] United's primary advertisement for the "Flexible Fund" was headed "New Opportunity for Financial Growth." United's sales aid kit included displays emphasizing the possibility of investment return and the experience of United's management in professional investing.

explicit what seems to be the view of the great majority of blue sky administrators to the effect that variable annuities are securities . . . ." 1 Loss, Securities Regulation 499. Given *VALIC,* we hold that for the purposes of the Securities Act these contracts are also to be considered nonexempt securities and cannot be offered to the public without conformity to the registration requirements of § 5.

Because the courts below considered the contract itself to be exempt, they did not reach the question whether the "Flexible Fund" was an "investment company" under the Investment Company Act of 1940. In *VALIC* the sole business of the insurer was the issuance of the contracts held to be securities, and thus the Court held the insurer to be an investment company. It is clear, however, that United in the main is an insurance company exempt from the requirements of the Investment Company Act. Moreover, the provisions of that Act are substantive and go well beyond the disclosure requirements of the Securities Act. Thus the question whether the fund may be separated from United's other activities and considered an investment company is a difficult one. See Comment, 61 Mich. L. Rev. 1374; Note, Regulation of Variable Annuity Sales: The Aftermath of SEC v. VALIC, 1959 Wash. U. L. Q. 206. An investigation into the relationship between the "Flexible Fund" and United's insurance business, as well as an investigation of the possible conflicts between state and federal regulation, is required for a proper resolution. The SEC has requested us to remand the case for further consideration of this issue, and in view of its complexity, we deem this the wisest course.

The judgment of the Court of Appeals for the District of Columbia Circuit is reversed and the case is remanded to that court for further proceedings consistent with this opinion.                    *It is so ordered.*