EQUITABLE LIFE INSURANCE CO. OF IOWA, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Equitable Life Ins. Co. v. Commissioner
Docket No. 2612-75.
United States Tax Court
T.C. Memo 1977-299; 1977 Tax Ct. Memo LEXIS 142; 36 T.C.M. (CCH) 1184; T.C.M. (RIA) 770299; September 6, 1977, Filed Marvin F. Peterson, for the petitioner. Ronald M. Frykberg, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined that petitioner, as transferee of the assets of Equity Insurance Company of Iowa, is liable for a deficiency in the transferor's 1969 corporate income tax of $14,122.95. The sole issue for decision is whether expenses incurred by Equity Insurance Company of Iowa (the transferor) *143 in registering with the Securities and Exchange Commission certain variable annuity contracts under the Securities Act of 1933 and the Equity of Iowa Variable Annuity Account pursuant to the provisions of the Investment Company Act of 1940 are deductible expenses. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Equitable Life Insurance Company of Iowa ("Equitable"), is a corporation organized under the laws of the State of Iowa. At the time it filed its petition, petitioner's principal office was in Des Moines, Iowa. Petitioner is the transferee of Equity Insurance Company of Iowa ("Equity"). A. General Background.
Life insurance companies continually look for new ideas for life insurance products from their sales force, management *144 and home office people. Products for new policies are analyzed to determine whether the product can be marketed on a profitable basis over a long-term period. Life insurance contracts must be filed and approved by the state insurance departments in the state in which the company does business. Variable annuity contracts must also be filed with the various state insurance departments, and, in addition, must be registered with the Securities and Exchange Commission. After the insurance contracts are approved by the various states, the contracts are announced to the field and promotional material is provided to suggest how new contracts might be sold. It is customary in the insurance industry to share various product ideas, and new contracts become common knowledge because of the filing requirement by the various states. There is no prohibition of one insurance company duplicating or using the same terms of the contract of another company. It is also common practice in the insurance industry continually to review the outstanding products to make certain the field force has an exciting contract to sell. It is necessary continually to make changes in the portfolio of products *145 by changing existing policies, developing new policies, and terminating outdated policies. B. Equity's Variable Annuity Contracts.
As part of its product development program, Equitable in the late 1960's decided to market a contract containing a variable annuity option. A variable annuity is similar to a fixed-dollar annuity except that investment risk is transferred to the annuitant. Under a fixed-dollar annuity, the annuitant receives in exchange for his premium deferred annuity payments which are fixed in amount throughout the payment period. With a variable annuity, the annuity payments are not fixed but instead vary in amount depending upon the investment experience of the separate variable annuity account. Equitable had not previously sold variable annuities. It decided to market a variable annuity because it concluded that a ready market existed for an annuity which, through its variable payment feature, allowed the annuitant to participate in the rise in stock values normally characteristic of an inflationary period. Furthermore, other major insurance companies had already begun to offer variable annuity contracts, and Equitable concluded that to remain competitive *146 it too must offer one. To handle its variable annuity contracts, Equitable incorporated Equity as a wholly-owned subsidiary on July 11, 1968. Equitable chose to organize a subsidiary, among other reasons, in order to free its other operations from the accounting and disclosure requirements of the Securities and Exchange Commission ("SEC"). Equitable transferred capital of $1,000,000 to Equity, consisting of $350,000 of common stock and $650,000 of paid-in capital. On November 19, 1968, the Insurance Department of the State of Iowa licensed Equity to engage in business as a life insurance company. Equity offered an annuity contract which contained both fixed annuity options and variable annuity options. More specifically, the annuitant paid a specific periodic premium, and Equity credited these premiums to the annuitant's account in the form of accumulation units. An accumulation unit's value depended on the value of the pool of investments which had been purchased with the total premiums paid by all the purchasers of the annuity. The value of the overall pool was periodically updated to reflect the changing values of the investments. The investments were primarily common *147 stocks. An annuitant, during the period in which he is paying premiums, can terminate the contract and receive the then-market value of his accumulation units. At the maturity date of the contract, the accumulation units are converted into annuity units, whose value, after certain adjustments, depends on the value of the underlying investment portfolio. At this point, the annuitant makes a binding choice between the number of these units he wishes to be fixed dollar annuity units and the number he wishes to be variable annuity units. The monthly payments under the fixed dollar annuity options remain fixed as to dollar amounts, while the payments under the variable annuity options fluctuate with the changes in value of the underlying investment portfolio. If the annuitant elects only fixed annuity options, he in effect elects to terminate his variable annuity contract. On June 20, 1969, Equity established the Equity of Iowa Variable Annuity Account A ("Separate Account"). The purpose of the Separate Account was to segregate the assets held under the variable annuity contracts from Equity's general assets. Such separation was required by Iowa law. To perfect its legal *148 right to market the variable annuity contract, Equity had to register the variable annuity contract with the SEC under the Securities Act of 1933. It filed the initial registration statement with the SEC on August 5, 1969, and an amendment to the statement on March 23, 1970. In addition, to comply with the Investment Company Act of 1940, Equity had to register the separate account as a management investment company with the SEC. It filed an original registration, which was subsequently amended. In connection with these two SEC registrations, Equity incurred the following expenses in 1969: Management fees, approximating a time
$ 2,500.00
expenditure of 188 hours by P. B. Hill
Legal fees incurred in registering with
the SEC, including the completing of
the necessary forms and testifying at
the registration hearing
20,397.51
Accounting fees
1,850.00
Registration fee paid to the SEC
2,000.00
Total
$26,747.51 To further comply with SEC requirements, Equity issued a prospectus for the purpose of marketing its variable annuity contracts. On March 25, 1970, the SEC declared that Equity's registration statement was effective pursuant to section 8(a) of the *149 Securities Act of 1933. Equity also had to have its variable annuity contract approved by the Department of Insurance of the State of Iowa before it could offer the contract to the public. The Department of Insurance approved the contract on March 27, 1970. Prior to receiving SEC approval, on July 28, 1969 Equity sold variable annuity contracts in the amount of $377,183.06 to the Equitable Life Insurance Company of Iowa Home Office Pension Plan Committee and Agency Office Pension Plan Committee. The proceeds were placed in the Separate Account. Each participant for whose benefit a contract was purchased furnished Equity a written statement containing the following: I understand that I may request the said Pension Committee to void said contract issued pursuant to the aforementioned master application within 45 days after the contract has been effectively registered with the Securities Act of 1933. During Equity's existence, the only insurance policy or annuity contract it marketed was the variable annuity contract. Around the end of 1970, Equitable decided to liquidate Equity. By that time state insurance commissioners were beginning to require life insurance companies *150 to submit to independent audits. Furthermore, Equitable was considering a public offering, which would also necessitate public disclosure of corporate information. Additionally, Equitable had experienced a change in management since forming Equity, and the new managers felt Equity was not achieving the goals originally set for it. Equitable dissolved Equity on or about December 29, 1970, Equitable acquired Equity's assets and assumed its liabilities. After the dissolution, Equitable continued to sell the variable annuity contracts. On its 1969 life insurance company income tax return (Form 1120L) Equity deducted $26,747.51 for expenses incurred in registering the variable annuity contract and the Separate Account with the SEC. Respondent disallowed these deductions in his statutory notice of deficiency. OPINION In 1968 petitioner organized Equity as a vehicle for marketing variable annuity contracts. Equity thereafter in 1969 established Equity of Iowa Variable Annuity Account A ("Separate Account"), in which it placed the premiums it received from annuitants. Before being legally authorized to offer these contracts to the public, Equity was required to register the variable *151 annuity contracts with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933 and register the Separate Account as a management investment company pursuant to the provisions of the Investment Company Act of 1940. Petitioner contends that the expenses which Equity incurred in registering the variable annuity contracts and the Separate Account with the SEC are ordinary and necessary business expenses under section 162. [2] Respondent argues that these expenses were not "ordinary", and furthermore that they represent start-up expenses which must be capitalized. A. Is Registration Expense "Ordinary"?
Section 162 allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." There is no dispute that the expense involved was "paid or incurred during the taxable year," and the parties also agree that the expense was "necessary." The annuity contracts could not be sold to the public without being registered. The first question raised by the parties is whether *152 the expense is "ordinary"? "Ordinary" is not easily defined. "Ordinary" is "a variable affected by time and place and circumstance. Ordinary in this context [business expense deduction] does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely.Nevertheless, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. The situation is unique in the life of the individual affected, but not in the life of the group, the community of which he is a part." (Citation omitted.) Welch v. Helvering,290 U.S. 111, 114 (1933). "Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happened but *153 once in the taxpayer's lifetime. Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." (Citations omitted.) Deputy v. DuPont,308 U.S. 488, 495 (1940). Whether an expense is "ordinary" is a question of fact. Commissioner v. Heininger,320 U.S. 467, 475 (1943). Looking at the facts in this case, we conclude that the expense of registering the variable annuity contracts and the Special Account with the SEC was an ordinary expense. All the major insurance companies offered a multitude of variable annuity contracts. Each type of contract must be registered with the SEC by each company. See SEC v. Variable Annuity Life Insurance Co.,359 U.S. 65 (1959); SEC v. United Benefit Life Insurance Co.,387 U.S. 202 (1967). Equity had only one such registration in its brief life because it sold only one form of variable annuity contract. However, since registration is required for each new or modified annuity contract marketed by any particular insurance company, *154 registration is not a once-in-a-lifetime expenditure for similarily situated insurance companies. This registration expense is normal, usual and customary in the day-to-day operations of the insurance business. It is an ordinary expense in the community of which petitioner is a member. Under the circumstances, we conclude that the cost of registering the variable annuity contract and the Special Account is both ordinary and necessary. [3]
Respondent in arguing that the registration expense is not an ordinary expense relies on Consumers Water Co. v. United States,369 F. Supp. 939 (D. Me. 1974). In that case the taxpayer-corporation had to register its capital stock with the SEC as a result of the Securities Act Amendments of 1964. The District Court held that the registration expense was not "ordinary" under the particular facts of that case. The District Court concluded that the cost was not only not *155 ordinary, but was probably capital because incurred for purposes related to corporate structure or existence, the benefit of which is of indefinite duration. Consumers Water Co. is distinguishable from the instant case on its facts. Equity was already a fully-organized, capitalized corporation qualified to carry on the insurance business in Iowa prior to registering the variable annuity contracts. Equity was not registering its corporate stock. Moreover, the registration of variable annuity contracts is not a one-time act inasmuch as each new kind of variable annuity contract must be registered by the same company, and each company must register the identical contract sold by it. Respondent next argues that the registration of the variable annuity contract is not ordinary because it is a capital expense incurred in acquiring a capital asset, an "intangible right" publicly to sell that particular variable annuity contract for an indefinite time. Respondent likens this "intangible asset" to a valuable franchise like an ICC operating permit, an FCC television license, or a license to practice law. Respondent is mistaken. The registration of the variable annuity contract *156 is not a capital expense like the acquisition of a license to commence operation of a business. The variable annuity contract is simply another product in the insurance business and the expense of placing it on the market is part of the day-to-day expense (here a selling expense) of producing and marketing a business product. While petitioner could not sell this particular variable annuity contract to the public without registering it with the SEC, petitioner was licensed by the State of Iowa to carry on the insurance business and prior to registering the variable annuity contract could sell the variable annuity contract privately and the other, more traditional insurance products publicly. B. Is the Registration Expense a Pre-Operating Expense?
The second question raised by the parties is whether petitioner was "carrying on" a trade or business when the registration expenses were incurred. Respondent argues that these expenses were start-up or pre-operating expenses which must be capitalized, relying on Richmond Television Corp. v. United States, 345 F. 2d 901 (4th Cir. 1965). Petitioner points out that over a year prior to the registration of the *157 annuity contract Equity was a fully-qualified life insurance company under the laws of the State of Iowa and adequately capitalized. Therefore, petitioner asserts, Equity was carrying on business when it incurred the registration expenses in issue. Moreover, Equity was a wholly-owned subsidiary of Equitable, which was an operating life insurance company of long standing. Petitioner therefore concludes that since Equity was a subsidiary of a going company, it too was carrying on business from its formation. We recognize that there can be many standards for determining when a taxpayer has begun to "carry on" its trade or business within the meaning of section 162. For example, the respondent's regulations under section 248 (election to amortize organization expenses) provide: * * * The determination of the date the corporation begins business presents a question of fact which must be determined in each case in light of all the circumstances of the particular case. * * * Ordinarily, a corporation begins business when it starts the business operations for which it was organized. * *158 * * If the activities of the corporation have advanced to the extent necessary to establish the nature of its business operations, however, it will be deemed to have begun business. For example, the acquisition of operating assets which are necessary to the type of business contemplated may constitute the beginning of business. Section 1.248-1(a)(3), Income Tax Regs. Compare Richmond Television Corp. v. United States, 345 F. 2d 901 (4th Cir. 1965). In that case the Fourth Circuit held that expenses incurred by Richmond Television Corporation before obtaining its FCC license to broadcast were pre-operating expenses because not incurred in "carrying on" a trade or business. The parties agreed that the expenses (primarily the cost of training personnel to operate the television broadcasting station) were otherwise ordinary and necessary business expenses. Accord Cohn v. United States, 52 AFTR 1298, 1304, 57-1 USTC par. 9457 (W.D. Tenn. 1957), affd. on other grounds 259 F. 2d 371 (6th Cir. 1958) (cost of training flying instructors prior to receiving flying students a pre-operating cost of flying schools). *159 Generally "'carrying on a trade or business' * * * involves holding one's self out to others as engaged in the selling of goods or services." Deputy v. DuPont, 308 U.S. 488, 499 (1940) (Frankfurter, J., concurring). On the facts before us, we conclude that Equity was carrying on its business in 1969, the year in which it incurred the expenses in issue. Equity was in the business of selling insurance products. It developed and sold a variable annuity contract to Equitable's pension plans. The fact that a participant in the plans could void the sale as to any contract purchased on his behalf within 45 days after the contract had been effectively registered does not, in our view, change this result. Many sales made by a reputable business firm are conditional on the purchaser being satisifed (e.g., the money back guarantee). Moreover, there is no indication that any of the participants sought to void any part of the sale. Equity's business was not limited to public sales of insurance and annuity contracts but simply sales of such contracts. Therefore, the private sale of annuity contracts to Equitable's pension plans was part of its business. From *160 that point on Equity was "carrying on" a business. Equity filed its original registration statement on August 5, 1969, and an amended statement on March 23, 1970. The SEC issued its order on March 25, 1970. The expenses paid and incurred in connection with the registration statements during 1969 are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Equity is entitled to deduct these expenses. Decision will be entered for the petitioner. Footnotes
1. The parties have stipulated that petitioner is a transferee, within the meaning of section 6901 of the Internal Revenue Code of 1954↩, of Equity Insurance Company of Iowa, transferor, and as such is liable for the payment of any deficiency in income tax for the taxable year 1969 which this Court determines to be due from Equity, plus interest thereon as provided by law.
2. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
3. See Rev. Rul. 73-463, 1973-2 C.B. 34, wherein respondent states that stock issuance expenses of an open-end investment, except those incurred during the 90-day initial stock offering, are deductible as business expenses under section 162↩.