419 F.2d 1250
 Fed. Sec. L. Rep. P 92,539
Joyce Cardner OLPIN and LeRoy M. Richman, for themselves,
and for and on behalf of all other persons
similarly situated, Plaintiffs-Appellants,
v.
IDEAL NATIONAL INSURANCE COMPANY, a Utah corporation, W. W.
Clyde, William I.Spere, James D. Moyle, Jack
Maurer, Alan B. Blood, Charles T. S.
Parsons andJohn S. Boyden,
Defendants-Appellees.
 No. 143-69.
 United States Court of Appeals Tenth Circuit.
 Dec. 17, 1969.
 
 Parker M. Nielson, Salt Lake City, Utah (Adam M. Duncan and Joel M. Allred, Salt Lake City, Utah, on the briefs), for appellants.
 David K. Watkiss, Salt Lake City, Utah (Wallace R. Bennett, Salt Lake City, Utah, on the brief), for appellees.
 Before PHILLIPS, BREITENSTEIN and HICKEY, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 This is a class action, brought by Olpin and Richman on behalf of themselves and all other persons similarly situated against Ideal National Insurance Company[1] and Clyde, Spere, Moyle, Maurer, Blood, Parsons and Boyden. The individual defendants are the officers and directors of Ideal.
 
 
 2
 Prior to the mergers referred to, infra, Mutual Life of America and Great Mutual Life Insurance Company were insurance companies licensed to do business in Utah under the applicable insurance laws of that state. While so licensed and before such mergers, they attached to certain policies of life insurance issued by them an Endorsement entitled 'Expansion and Bonus Fund Endorsement.' A copy of one of such Endorsements, with which the others are identical, except as to the date of issue, is marked 'ATTACHMENT I' and attached to the complaint and made a part thereof. It reads as follows:
 
 
 3
 'MUTUAL LIFE OF AMERICA EXPANSION AND BONUS FUND ENDORSEMENT
 
 
 4
 'This endorsement and the benefits provided for herein are limited to 2500 units of insurance under policies bearing this endorsement.
 
 
 5
 'The Company agrees to annually set aside in a special fund on December 31, of each year, until the calendar year 1967, not less than $1.00 and not more than $2.00 per thousand as the Board of Directors may annually elect, for each thousand dollars of life insurance issued on a paid-for basis and remaining in full force between May 1, 1948 and the end of the calendar year 1967, except insurance of the class to which this Endorsement is attached and any Group Life insurance which may be issued by the Company. Such special bonus fund shall be accumulated at 2 1/2% Annual compound interest.
 
 
 6
 'Within ninety days (90) following January 1, 1968, such accumulated bonus fund deposit, together with interest accretions, will be distributed by the Company to all surviving policyholders whose policies bear this endorsement and are in full force and on a premium paying basis. The share to be paid to each qualifying policyholder will be the proportion whith the number of units in this policy bears to the total number of units of similarly qualifying policies.
 
 
 7
 'No deduction whatsoever will be made from the Bonus Fund, prior to the date of distribution above provided, except in case of the death of the insured prior to the 1968 distribution date, in which event the designated beneficiary of the insured shall be paid in addition to the face amount of this policy, the full proportionate share of this policy in the bonus fund accumulation calculated as of the end of the calendar year prior to the date of death.
 
 
 8
 'April 22, 1948 (s) J. A. Keller
 
 
 9
 08rDate Endorsement'
 
 
 10
 After the policies bearing such Endorsement were issued, Mutual Life and Great Mutual Life were merged into Pacific Western Insurance Company, and after that merger, Pacific Western was merged into Ideal. Ideal is liable for all the obligations created by such Endorsement to the owners of policies to which it was attached, who were surviving on January 1, 1968, and whose policies were then in full force and effect on a premium paying basis.
 
 
 11
 Mutual Life and Great Mutual Life sold in excess of 600 policies to which such Endorsement was attached. Substantially all of them were sold in the State of Utah and a majority of the members of the class are inhabitants of Utah.
 
 
 12
 The premiums charged for the policies bearing such Endorsement were higher than the amount that would have been charged for such policies, had they not carried such Endorsement, but the policies bearing such Endorsement provided for one single amount of premium and did not provide a separate amount charged for or because of such Endorsement.
 
 
 13
 The class includes two groups. The first group is composed of policyholders whose policies bore such Endorsement and were in full force on a premium paying basis on January 1, 1968, and who survived that date and still retained the Endorsement.
 
 
 14
 The second group is identical with the first group, except that in response to a letter from Ideal, dated August 22, 1968, and more particularly referred to, infra, they had elected to surrender their Expansion and Bonus Fund Endorsements to Ideal under one of four options set out in the letter.
 
 
 15
 In the complaint, the foregoing facts and others hereinafter set out were alleged.
 
 
 16
 The complaint contained three causes of action. The first two sought specific performance of such Endorsement, or in the alternative, damages. The third cause of action incorporated in it the allegations in the first two causes of action by reference, and prayed that defendants be required to specifically perform the covenants and obligations of Ideal under such Endorsement, and to pay to Olpin and Richman and all other members of the class 'in accordance with the terms of' such Endorsement 'a pro-rata share of the fund as contemplated by the Endorsement and applicable law.'
 
 
 17
 The letter of August 22, 1968, which was sent to each holder of a policy bearing such Endorsement and in force on January 1, 1968, stated that the policies bearing such Endorsement were not written or sold by Ideal, but were 'acquired' by Ideal through its merger with Pacific Western; that after it acquired such policies as the insurer, it followed the previously approved practices employed by Pacific Western in computing and administering the funds intended to be paid out upon the maturity of such Endorsement; that in the fall of 1967 Ideal underwent its regular examination by the Utah State Insurance Department, and that during the course of such examination a question was raised concerning the method employed to calculate the reserves necessary to provide funds for distribution according to the terms of such Endorsement, and that the Insurance Department sought the opinion of the Attorney General of the State of Utah with respect thereto; that the Attorney General gave the Insurance Department an opinion in which he stated that such Endorsement was illegal and void under the statutes of Utah, but that the basic policy to which the Endorsement was attached was valid. The Attorney General recommended that Ideal be required to refund to the appropriate policyholders that portion of the total premium they paid which could be allocated to such Endorsement, less a small administrative fee.
 
 
 18
 The letter further stated that in view of the opinion of the Attorney General, the Board of Directors of Ideal had reviewed the matter thoroughly and found that 'on one side that the merger has vested in us a Bonus Fund Endorsement that is illegal and void,' and that 'on the other side, policyholders have been investing in the endorsement in good faith for a number of years with the expectation of a handsome return on their investment,' and that Ideal wished to do as much as it legally could for holders of policies bearing such Endorsement; that in an effort to find a solution which would be legally acceptable and fair to the policyholders and stockholders, Ideal had the Commissioner of Insurance of the State of Utah review plans of settlement consisting of four options, and that the Commissioner's office had approved Options A and B and stated that it had no objection to Options C and D. The options were set forth in the letter.
 
 
 19
 Option A stated that Ideal would refund to the holdr of a Bonus Fund Endorsement that amount computed to be the amount of total premium paid by such policyholder for such Endorsement.
 
 
 20
 Option B provided that Ideal would furnish paid-up life insurance to the holder of a Bonus Fund Endorsement in an amount which the payment described in Option A would purchase at the age of such holder on the maturity date of the Bonus Fund Endorsement.
 
 
 21
 Option C provided that if the holder of a Bonus Fund Endorsement would execute a release of any and all claims such holder might have acquired against Ideal, that Ideal would pay to the holder the amount shown in a table submitted to the Commissioner.
 
 
 22
 Option D provided that Ideal would furnish paid-up life insurance ot the holder of a policy bearing the Bonus Fund Endorsement in an amount which the payment described in Option C would purchase for such holder at his age on the maturity date of his Bonus Fund Endorsement. It also required the execution of a release, as provided in Option C.[2]
 
 
 23
 The amount to be paid under Options A and C and the amount of paid-up insurance under Options B and D, applicable to the addressee of the letter, were shown on a sheet enclosed therewith.
 
 
 24
 The letter further stated that regardless of what option the policyholder selected, the insurance would be continued at a reduced premium, and that he would receive a billing showing the amount of the new premium in a few days after the date of the letter.
 
 
 25
 The letter was signed by Spere, as Executive Vice President and General Manager of Ideal.
 
 
 26
 A holder of a policy bearing such Endorsement, when he received his policy, also received a letter from the insurer, which congratulated him for having made a 'wise and sound Investment'; which characterized as 'guaranteed savings * * * the amount shown on the policy' and which stated he made a wise and sound decision when be 'made application for this protection.'
 
 
 27
 In the complaint, it was alleged that such Endorsement constituted 'a 'security' within the language, meaning and intent of the Investment Company Act of 1940, and Section 2(a)(35) thereof (15 U.S.C. 80a-2(a)(35)), and the provision of the Securities Exchange Act of 1934, and Section 3(10) thereof (15 U.S.C.A. 78c(10)),' and it was further alleged generally that subject matter jurisdiction of the three claims set up in the complaint existed 'by reason of the provisions of 28 U.S.C. Section 1337 and of the specific Congressional enactments hereinafter referred to.'
 
 
 28
 In the first cause of action it was alleged that subject matter jurisdiction of the claim therein asserted existed 'by virtue of the provisions of Section 44 of the Investment Company Act of 1940 (15 U.S.C. 80a-43)' and 'by reason of the fact that various means or instrumentalities of interstate commerce, and of the mails, were used' by Ideal 'in connection with the offer, sale, redemption, retirement, acquisition and delivery of the securities referred to' therein, and it was further alleged in the first cause of action that by virtue 'of the 'Bonus Fund Endorsement' plan, and as a necessary and integral part thereof' Olpin, Richman, and the members of the class 'were requested to, and did, commit their funds to the hands of' Ideal and the individual defendants and to the predecessors of Ideal 'on an equity basis, with the view that' such funds 'would be invested in securities' and that Olpin, Richman, and the other members of the class 'would be paid a pro rata share of the accumulated bonus fund, including a variable percentage of all life insurance issued by * * * Ideal and its predecessors, and interest compounded thereon, within ninety (90) days following January 1, 1968'; that Ideal 'is an 'Investment Company' within the meaning and intent of Section 3(a) of the Investment Company Act of 1940 (15 U.S.C. 80a-3(a)) with respect to' such 'Bonus Fund Endorsement by reason of the fact that a separate reserve fund of amounts paid by policy holders was established for the purpose of investment and management by' Ideal and the individual defendants 'and that, as to' such 'separate reserve fund, * * * Ideal held itself out as being engaged primarily, or proposed to engage primarily, in the business of investing, reinvesting or trading in securities and engaged or proposed to engage in the business of investing, reinvesting, owning, holding or trading in securities, and owned or proposed to acquire investment securities having a value exceeding 40 per centum of the value of the total assets of' such 'separate reserve fund (exclusive of Government securities and cash items) on an unconsolidated basis'; and that Ideal and the individual defendants 'have not registered' such 'Fund or the securities issued by them representing an interest in' such 'Fund pursuant to the provisions of the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.) or the Securities Act of 1933 (15 U.S.C. 77a et seq.).'
 
 
 29
 In the second cause of action it was alleged that subject matter jurisdiction of the claims asserted therein existed 'by reason of the provisions of Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. 78aa et seq.) and further, by reason of the fact that the claims alleged' therein arose from conduct which violated 'the proscriptions of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j) and the provisions of 17 C.F.R. Section 240 10b-5 adopted pursuant thereto'; that Ideal contacted Olpin, Richman, and the other members of the class by the letter of August 22, 1968, and purchased, or attempted to purchase by means of the release which accompanied such letter, the interests of Olpin, Richman, and the other members of the class in their Bonus Fund Endorsement, and that such interest in the Fund and such release were each a 'security' within the meaning and intent of the Securities Exchange Act of 1934; and that Ideal and the individual defendants 'in relation to the acquisition of interests in the Fund and the issuance of the letter and 'Release' * * * employed various devices, schemes or artifices to defraud; made untrue statements of material facts or omitted to state material facts' and engaged in fraudulent and deceitful acts and practices, which were set forth with particularity in the second cause of action.
 
 
 30
 The allegations of the first and second causes of action were incorporated by reference in the third cause of action, and subject matter jurisdiction of the claims set up therein was predicated on the jurisdictional allegations of both the first and second causes of action.
 
 
 31
 Ideal and the individual defendants did not file an answer to the complaint. They moved to dismiss it on the grounds that:
 
 
 32
 1. Each cause of action, factually and as a matter of law, failed to state a claim against Ideal and the individual defendants upon which relief could be granted;
 
 
 33
 2. The court lacked jurisdiction, because it appeared on the face of the complaint that the claims of Olpin, Richman, and the other members of the class did not arise under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies, as provided under 28 U.S.C. 1337, and
 
 
 34
 3. The court lacked jurisdiction, because it appeared on the face of the complaint that the alleged claims of Olpin, Richman, and the other members of the class did not arise under the Constitution, laws, or treaties of the United States, as alleged in each cause of action of the complaint.
 
 
 35
 The trial court sustained the motion and dismissed the complaint on the ground that it lacked subject matter jurisdiction. It granted leave to Olpin and Richman to amend their complaint. They elected not to amend. A judgment was then entered, dismissing the action on the ground that the court lacked jurisdiction. From that judgment, Olpin and Richman have appealed.
 
 
 36
 It was the duty of the trial court and it is the duty of this court to liberally construe and accept as true the allegations of fact in the complaint and the inferences reasonably deductible, therefrom. However, neither the trial court nor this court is bound to accept mere legal conclusions or factual claims at variance with the express terms of the Bonus Fund Endorsement, itself, which is attached to the complaint as an exhibit and by reference made a part thereof.[3]
 
 
 37
 The questions presented for our determination are these:
 
 
 38
 1. Did the Expansion and Bonus Fund Endorsement attached to ordinary life insurance policies issued by the predecessors of Ideal, or the special fund set up by such predecessors and Ideal pursuant to such Endorsement, or the interests therein of Olpin, Richman, and the order members of the class, constitute Ideal and its predecessors an 'investment company' within the meaning of the Investment Company Act of 1940 (15 U.S.C. 80a-3(a)); and
 
 
 39
 2. Did such Endorsement, the rights and interests of the holders of policies bearing the Endorsement in the fund created by or pursuant thereto, or the releases submitted to the policyholders with Ideal's letter of August 22, 1968, or any of them, constitute a 'security' within the meaning of the provisions of the Investment Company Act of 1940, the Securities Exchange Act of 1934, or the Security Act of 1933, or any of them?
 
 
 40
 We think we will be aided in determining the answer to these questions by a consideration of three decisions of the Supreme Court. They are: Securities and Exchange Commission v. Variable Annuity Life Insurance Co. of America (decided March 31, 1959), U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640; Securities and Exchange Commission v. United Benefit Life Insurance Co. (decided May 22, 1967), 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673, and Tcherepnin v. Knight (decided December 18, 1967), 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564.
 
 
 41
 In the Variable Annuity Life Insurance case, the Securities and Exchange Commission sought to enjoin the issuers of variable annuity contracts from offering their contracts to the public without registering them under the Securities Act of 1933 (48 Stat. 74, 15 U.S.C. 77a) and complying with the Investment Company Act of 1940 (54 Stat. 789, 15 U.S.C. 80a-1).
 
 
 42
 The action was instituted in the United States District Court for the District of Columbia, which denied the relief sought by the Commission. The United States Court of Appeals for the District of Columbia affirmed, 103 U.S.App.D.C. 197, 257 F.2d 201. The case came before the Supreme Court on petitions for writs of certiorari, granted by it.
 
 
 43
 The respondents, issuers of contracts of variable annuities, were regulated by the insurance laws of the District of Columbia and those of several states, and they argued that they were exempt from the Investment Company Act of 1940 and the Securities Act of 1933 by reason of the exemption provisions of the McCarran-Ferguson Act (59 Stat. 34, 2(b)), from the Securities Act of 1933 by its provisions (48 Stat. 76, 3(a)(8)), and from the Investment Company Act of 1940 by its provisions (54 Stat. 798 and 793, 3(c)(3) and 2(a)(17)).
 
 
 44
 In its opinion in the Variable Annuity Company case, the court in part said:
 
 
 45
 'While all the States regulate 'annuities' under their 'insurance' laws, traditionally and customarily they have been fixed annuities, offering the annuitant specified and definite amounts beginning with a certain year of his or her life. The standards for investment of funds underlying these annuities have been conservative. The variable annuity introduced two new features. First, premiums collected are invested to a greater degree in common stocks and other equities. Second, benefit payments vary with the success of the investment policy. The first variable annuity apparently appeared in this country about 1952 when New York created the College Retirement Equities Fund to provide annuities for teachers. It came into existence as a result of a search for a device that would avoid paying annuitants in depreciated dollars. The theory was that returns from investments in common stocks would over the long run tend to compensate for the mounting inflation. The holder of a variable annuity cannot look forward to a fixed monthly or yearly amount in his advancing years. It may be greater or less, depending on the wisdom of the investment policy. * * *
 
 
 46
 'The difficulty is that, absent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company. * * * In hard reality the issuer of a variable annuity that has no element of a fixed return assumes no true risk in the insurance sense. * * * In common understanding 'insurance' involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts. * * * The companies that issue these annuities take the risk of failure. But they guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities-- an interest that has a ceiling but no floor. There is no true underwriting of risks, the one earmark of insurance as it has commonly been conceived of in popular understanding and usage.'
 
 
 47
 The Supreme Court reversed and remanded the cases.
 
 
 48
 S.E.C. v. United Benefit Life Insurance Company involved a so-called 'Flexible Fund Annuity.' The purchaser of a 'Flexible Fund Annuity' agreed to pay a fixed monthly premium for a number of years before a specified maturity date. The premium, less a deduction for expenses (the net premium), was placed in a 'Flexible Fund' account, which United Benefit maintained separately from its other funds, pursuant to the laws of Nebraska (Neb.Rev.Stat. 44-310.06 (1963 Cum.Supp.)). United Benefit agreed to invest the 'Flexible Fund' with the object of producing capital gains, as well as an interest return, and it invested the major part of the fund in common stocks.
 
 
 49
 The purchaser, at all times before maturity, was entitled to his proportionate share of the total fund and could withdraw all or any part of such interest. The purchaser was also entitled to an alternative cash value measured by a percentage of his net premiums, which gradually increased from 50 per cent the first year to 100 per cent after 10 years. At maturity, the purchaser could elect to receive the cash value of his policy, measured either by his interest in the fund or by his net premium guarantee, whichever was larger. At maturity, he could also elect to convert his interest into a life annuity under conditions specified in the 'Flexible Fund' contract. Thus, the net premium guarantee became 'also a guarantee that a certain amount of fixed-amount payment life annuity' would be available to the purchaser at maturity.
 
 
 50
 At maturity, the purchaser received either the value of his interest in cash, or be converted it to a fixed-payment annuity and thereafter he had no further interest in the 'Flexible Fund.'
 
 
 51
 The action was instituted by the Securities and Exchange Commission in the United States District Court for the District of Columbia to enjoin United from offering its 'Flexible Fund Annuity' contracts without first meeting the registration requirements of the Securities Act of 1933, and to compel 'United to register the 'Flexible Fund' itself as an 'investment company" pursuant to the Investment Company Act of 1940. The District Court held that the guarantee of a fixed-payment annuity gave the entire contract the character of insurance, and that it was therefore not subject to regulation under the Securities Act. The Court of Appeals of the District of Columbia affirmed, 123 U.S.App.D.C. 305, 359 F.2d 619, and the case came before the Supreme Court for review on its writ of certiorari.
 
 
 52
 The S.E.C. contended in the lower courts and in the Supreme Court 'that the contract should be fragmented and the risk during the deferred period only should be considered.'
 
 
 53
 The Supreme Court held that the 'Flexible Fund' contract included two entirely 'distinct promises' and 'their operation' was 'separated at a fixed point in time' and held that the contract should be fragmented.
 
 The court in its opinion in part said:
 
 54
 '* * * In a conventional annuity where a fixed amount of benefits is stipulated it is essential that the premiums both cover expenses and produce a fund sufficient to support the promised benefits. In fixing the necessary premium mortality experience is a subordinate factor and the planning problem is to decide what interest and expense rates may be expected. There is some shifting of risk from policyholder to insurer, but no pooling of risks among policyholders. * * * The policyholder has no direct interest in the fund and the insurer has a dollar target to meet.
 
 
 55
 'The 'Flexible Fund' program completely reverses the role of the insurer during the accumulation period. Instead of promising to the policyholder an accumulation to a fixed amount of savings at interest, the insurer promises to serve as an investment agency and allow the policyholder to share in its investment experience. The insurer is obligated to produce no more than the guaranteed minimum at maturity, and this amount is substantially less than that guaranteed by the same premiums in a conventional deferred annuity contract. The fixed-payment benefits are adjusted to reflect the number of dollars available, as opposed to the conventional annuity where the amount available is planned to reflect the promised benefits.
 
 
 56
 'The insurer may plan to meet the minimum guarantee by split funding-- that is, treating part of the net premium as it would a premium under a conventional deferred annuity contract with a cash value at maturity equal to the minimum guarantee and investing only the remainder-- or by setting the minimum low enough that the risk of not being able to meet it through investment is insignificant. The latter is the course United seems to have pursued. In either case the guarantee cannot be said to integrate the pre-maturity operation into the post-maturity benefit scheme. * * * We therefore conclude that we must assess independently the operation of the 'Flexible Fund' contract during the deferred period to determine whether that separable portion of the contract falls within the class of those exempted by Congress from the requirements of the Securities Act, and, if not, whether the contract constitutes a 'security' within 2 of that Act, 48 Stat. 74, 15 U.S.C. 77b.
 
 
 57
 '* * * 'Flexible Fund' arrangements require special modifications of state law, and are considered to appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management. And while the guarantee of cash value based on net premiums reduces substantially the investment risk of the contract holder, the assumption of an investment risk cannot by itself create an insurance provision under the federal definition. * * * The basic difference between a contract which to some degree is insured and a contract of insurance must be recognized.'
 
 
 58
 The court held that the portion of the 'Flexible Fund' contract which dealt with the pre-maturity period was a security within the meaning of the Securities Act and that it did not fall within the insurance exemption of 3(a) of the Securities Act, 48 Stat. 78, 3(a).
 
 
 59
 The court further said in part in the opinion:
 
 
 60
 'We find it equally clear that the accumulation provisions constitute an 'investment contract' within the terms of 2 of the Securities Act. As the Court said in S.E.C. v. Joiner Leasing Corp., 320 U.S. 344, 352-353, 64 S.Ct. 120, 88 L.Ed. 88, 'The test * * * is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be.' Contracts such as the 'Flexible Fund' offer important competition to mutual funds, * * * and are pitched to the same consumer interest in growth through professionally managed investment. It seems eminently fair that a purchaser of such a plan be afforded the same advantages of disclosure which inure to a mutual fund purchaser under 5 of the Securities act. * * *'
 
 
 61
 The court reversed the judgment of the Court of Appeals and remanded the case for further consideration of the question of whether or not the 'Flexible Fund' was an 'investment company' under the Investment Company Act of 1940.
 
 
 62
 Tcherepnin v. Knight did not involve an insurance or an annuity contract. The question there was whether a withdrawable capital share in an Illinois savings and loan association was a 'security' within the meaning of the Security' Exchange Act of 1934, 48 Stat. 881. However, we think the court's discussion of the meaning of the term 'security,' as defined in that Act, and of the scope that Congress intended should be accorded to the term 'security' will be helpful in resolving our questions.
 
 In its opinion the court in part said:
 
 63
 '* * * This case presents the Court with its first opportunity to construe this statutory provision (the definition of security in the Securities Exchange Act of 1934, 48 Stat. 883, 3(a)(10)). But we do not start with a blank slate. The Securities Act of 1933 * * * contains a definition of security virtually identical to that contained in the 1934 Act. Consequently, we are aided in our task by our prior decisions which have considered the meaning of security under the 1933 Act. In addition, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of a security in 3(a)(10) necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality. S.E.C. v. W. J. Howey Co., 328 U.S. 293, i98, 66 S.Ct. 1100, 90 L.Ed. 1244 * * *.
 
 
 64
 'While Illinois law gives legal form to the withdrawable capital shares held by the petitioners, federal law must govern whether shares having such legal form constitute securities under the Securities Exchange Act. Even a casual reading of 3(a)(10) of the 1934 Act reveals that Congress did not intend to adopt a narrow or restrictive concept of security in defining that term. As this Court observed with respect to the definition of security in 2(1) of the Securities Act of 1933, 'the reach of the Act does not stop with the obvious and commonplace.' S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 * * *. As used in both the 1933 and 1934 Acts, security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' * * * We have little difficulty fitting the withdrawable capital shares held by the petitioners into that expansive concept of security. Of the several types of instruments designated as securities by 3(a)(10) of the 1934 Act, the petitioners' shares most closely resemble investment contracts. 'The test (for an investment contract) is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' * * * Petitioners are participants in a common enterprise-- a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings in making sound loans. Because Illinois law ties the payment of dividends on withdrawable capital shares to an apportionment of profits, the petitioners can expect a return on their investment only if City Savings shows a profit. If City Savings fails to show a profit due to the lack of skill or honesty of its managers, the petitioners will receive no dividends. Similarly, the amount of dividends the petitioners can expect is tied directly to the amount of profits City Savings makes from year to year. Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of investment contracts as that term is used in 3(a)(10) and as it was defined in Howey. * * *'
 
 
 65
 In our approach to the questions presented in the instant case, we deal with federal statutes, where the words 'insurance' and 'annuity' are federal terms and the meaning of those terms under such federal statutes is a federal question.[4]
 
 
 66
 The insurer, under a policy bearing such Endorsement, thereby became obligated to set aside on December 31, 1948, in the Bonus Fund, not less than $1.00 nor more than $2.00, as its Board of Directors should determine, for each $1,000 of life insurance issued by it on or after May 1, 1948, and in full force on a paid-for basis on December 31, 1948, except insurance under policies bearing such Endorsement and under group life insurance policies; and to set aside in the Bonus Fund on December 31, 1949, and on December 31 of each succeeding year thereafter, to and including the year 1967, an amount of not less than $1.00 nor more than $2.00, determined as above stated, for each $1,000 of nonexcluded life insurance issued by it on or after May 1, 1948, and in full force on a paid-for basis on December 31 of the particular year for which the amount was to be determined and set aside. That is to say, the amount to be set aside in a particular year was based not only on the insurance issued in that year, but also on the insurance theretofore issued on or after May 1, 1948, if the latter insurance was in full force on a paid-for basis on December 31 of such particular year.[5]
 
 
 67
 And such insurer also became obligated to accrete to the Bonus Fund on December 31, 1949, compound interest at the rate of 2 1/2 per cent per annum on the amount set aside in such Fund on December 31, 1948, and likewise on December 31 of each succeeding year after 1949, to and including the year 1967, so to accrete to such Fund compound interest at the rate of 2 1/2 per cent per annum on the amounts in the Fund at the end of the preceding year, including the compound interest accreted thereto.
 
 
 68
 Those were the obligations of Mutual Life, under policies bearing such Endorsement issued by it, and of Great Mutual Life, under such policies issued by it. And when Mutual Life and Great Mutual Life merged into Pacific Western, such obligations devolved upon it; and when Pacific Western merged into Ideal, such obligations devolved on Ideal.
 
 
 69
 Ideal and its predecessors had the right to invest the amounts set aside in the Bonus Fund and the compound interest accreted thereto; and the extra premiums paid by holders of policies bearing such Endorsement and the interest realized from investment of such premiums, subject to the requirements and limitations imposed by the insurance laws of Utah and its Insurance Department, and to receive the returns of such investments.[6] But the obligations of Ideal and its predecessors to pay each of such policyholders who survived the 1968 distribution date, if his policy was then in full force on a premium paying basis, his proportionate share of the accumulated Bonus Fund were in nowise dependent on whether Ideal and its predecessors derived sufficient funds from the additional premiums paid and from the investment thereof and of interest received from investment of such premiums; and from the investment of the aggregate of the amounts set aside in the Bonus Fund and the annual interest accretions thereto, to meet such obligations.
 
 
 70
 Likewise, the obligations of Ideal and its predecessors to the beneficiary of each holder of a policy bearing such Endorsement, who died before the 1968 distribution date, and if the policy was in full force on a premium paying basis when he died, to pay such beneficiary his full proportionate share of the amounts set aside in the Bonus Fund and the annual compound interest accretions thereto, computed as of the end of the calendar year before the policyholder's death, were in nowise dependent upon whether Ideal and its predecessors had derived on such computation date sufficient funds from the additional premiums that had been paid for such Endorsement and from the investment thereof and of interest received from the investment of such premiums; and from the investment of the aggregate of the amounts then set aside in the Bonus Fund and of the interest accretions thereto, to meet all of their obligations to policyholders and their beneficiaries, if the amounts of such obligations were calculated and payable as of such computation date. The obligations to the policyholders who survived the 1968 distribution date and to the beneficiaries of the policyholders who did not survive were absolute and unconditional.
 
 
 71
 True, Ideal and its predecessors could determine in each year from 1948 to 1967 whether the amount they set aside in the Bonus Fund should be $1.00 or $2.00 or some intermediate amount for each $1,000 of life insurance issued on a paid-for basis from and after May 1, 1948, and remaining in full force at the time of such determinations, with certain stated exceptions, and no doubt in making such determinations they gave consideration to the amount of additional premiums they had theretofore received for such Endorsement and the earnings they had theretofore received from the investment of such additional premiums and of interest derived from the investment of such premiums, and of the Bonus Fund accumulated as above set out. But when they had determined the amount to be set aside in the Bonus Fund on December 31 of a particular year, and had set it aside, their action was final and unconditional. If their forecast as to the future returns from such investments was greater than the returns actually realized, because of lapsed policies, unwise investments, changed economic conditions, or any other reason, the loss was a risk that Ideal and its predecessors bore, and no part of such risk was borne by the policyholders or their beneficiaries. Regardless of whether Ideal and its predecessors on December 31, 1967, had lost or made money on such Endorsement, each of the policyholders who survived the 1968 distribution date was entitled to receive his proportionate share, determined as provided in the Endorsement, of an amount equal to the aggregate of the amounts set aside on December 31 of each year from 1948 until 1967, plus an aggregate of the compound interest at the rate of 2 1/2 per cent per annum accreted thereto, less any amounts paid to beneficiaries of policyholders bearing such Endorsement, who died prior to such distribution date. And the beneficiary of the holder of such a policy, if the latter died before the 1968 distribution date, was entitled to receive his proportionate share, determined as provided in the Endorsement, of an amount equal to the aggregate of the amounts set aside on December 31 of each year from 1948 to December 31 of the calendar year prior to the death of the policyholder and the compound interest accreted thereto, up to such date, regardless of whether Ideal and its predecessors had then lost or made money on the policies bearing such Endorsement. And if Ideal or its predecessors realized a net profit on such Endorsement, no matter how great, neither the holders of policies bearing such Endorsement nor their beneficiaries were entitled to share in such profit.
 
 
 72
 From the foregoing, it will be seen that Ideal and its predecessors bore the entire risk that they might not realize from the investment of the amounts annually set aside in the Bonus Fund, plus the compound interest accretions thereto, and from the extra premiums paid by holders of policies bearing such Endorsement and from the investment thereof and of interest received from investment of such premiums, an aggregate amount sufficient to pay on the 1968 distribution date each holder of a policy bearing such Endorsement, who had not died prior to that date and whose policy was then in full force on a premium paying basis, an amount equal to his full proportionate share of the amounts set aside in the Bonus Fund, plus the interest accretions thereto, without any 'deduction whatsoever,' except amounts paid to beneficiaries of holders of policies bearing such Endorsement, who died prior to such date.
 
 
 73
 Ideal and its predecessors each set up a reserve from which to discharge its obligations under such Endorsement, and, no doubt subject to the limitations and requirements of the laws of Utah and its Department of Insurance, invested such reserve funds, but those facts, in our opinion, tend to show that such Endorsement was an insurance contract and not a security. Life insurance companies are normally required by state insurance laws or regulations thereunder to set up reserves to guarantee the performance of their life insurance policy obligations.[7] And they invest such reserve funds at their own risk in the normal operation of their insurance businesses.
 
 
 74
 It is true the holders of policies bearing such Endorsement may have been indirectly affected by the previous investment experience f Ideal and its predecessors when they annually considered and determined the amount within the prescribed limits they would set aside in the Bonus Fund during the period from 1948 to 1967, inclusive, but aside from that indirect effect, such holders had no interest in and in nowise were affected by investment gains or investment losses by Ideal or its predecessors, except losses so great that they would threaten the solvency of Ideal or its predecessors.
 
 
 75
 Such Bonus Fund Endorsement did not provide in fixed amounts the benefits that would be paid to the holder of a policy bearing such Endorsement if he survived the 1968 distribution date, or to his beneficiary in case the policyholder died prior to the 1968 distribution date. But it did provide factors from which specific amounts under the terms of the Endorsement were to be arrived at and paid to the policyholder if he survived the 1968 distribution date, or to his beneficiary in the event he did not so survive.
 
 
 76
 In the event the holder of a policy bearing such Endorsement survived the 1968 distribution date, the aggregate of the amounts required by the Endorsement to be set aside in the Bonus Fund by Mutual Life and Great Mutual Life, by Pacific Western after their merger into it, and by Ideal after Pacific Western's merger into it, on December 31 of each year during the period 1948 to 1967, inclusive, plus the aggregate of the compound interest required to be added to the Fund on December 31 of each year of the period 1949 to 1967, inclusive, less the amounts paid to beneficiaries, constituted the first factor. The second factor was the number of units in the policy of the surviving policyholder. The third factor was the aggregate of the number of units in all the policies bearing such Endorsement, in full force on a premium paying basis on the 1968 distribution date.
 
 
 77
 Such a policyholder was entitled to share in Factor No. 1 in the same proportion that his Factor No. 2 bore to Factor No. 3.
 
 
 78
 In the event the holder of a policy bearing such Endorsement died before the 1968 distribution date, and his policy was in full force on a premium paying basis at the time of his death, the first factor was the aggregate of the amounts required to be set aside in the Bonus Fund and the compound interest accretions required to be added thereto, computed on December 31 of the year prior to the policyholder's death, less the amount theretofore paid to beneficiaries. The second factor was the number of units in the policy of such deceased policyholder. The third factor was the aggregate of the number of units in all the policies bearing such Endorsement, in full force on a premium paying basis on December 31 of the year prior to such policyholder's death.
 
 
 79
 The beneficiary of such a policy was entitled to share in Factor No. 1 in the same proportion that Factor No. 2 bore to Factor No. 3.
 
 
 80
 Thus, it will be seen that with such factors, the amount of the Bonus Fund which Ideal and its predecessors were obligated to pay a policyholder or his beneficiary was a mere matter of mathematical calculation. And the amount payable to the insured or his beneficiary could be calculated at the end of 1948 and each year thereafter, to and including 1967.
 
 
 81
 Since, on December 31 of each year during the period from 1948 to 1967, inclusive, Ideal or one of its predecessors was required to set aside in the Bonus Fund not less than $1.00 nor more than $2.00, or some intermediate amount per $1,000, for each $1,000 of nonexcluded life insurance, which, since May 1, 1948, had then been issued by it or its predecessors and was then in force, and compound interest on the amount then accumulated in the Fund, as above more particularly set out, there was a floor beneath which the benefits to be paid to the policyholders or their beneficiaries could not fall.
 
 
 82
 When a policyholder died prior to the 1968 distribution date and the benefits were paid to his beneficiary, the Endorsement had many of the characteristics of an ordinary life insurance policy. When the policyholder survived the 1968 distribution date and the benefits were payable to him, the Endorsement had many of the characteristics of a 20-year endowment policy.
 
 
 83
 Clearly, when a policyholder paid an additional premium for a policy bearing such Endorsement, he was not investment his money in a security, speculative or otherwise, from which he might receive much, little, or no benefit, depending on the wisdom and care with which Ideal and its predecessors invested such extra premiums, and interest received from investment of such premiums, such amounts set aside annually in the Bonus Fund and such interest accretions thereto, or other factors which might favorably or unfavorably affect the earnings from such investment.
 
 
 84
 Accordingly, we conclude that neither the Endorsement nor the special fund created thereunder nor the release was a 'security' within the meaning of that term, as defined and used in the Securities Act of 1933 or the Securities Exchange Act of 1934, and that they were not 'investment securities' within the meaning of that phrase, as defined and used in the Investment Company Act of 1940.
 
 
 85
 Hence, we hold that it affirmatively appears that none of the claims set up in the three causes of action stated a claim within the jurisdiction of the United States District Court for the District of Utah.
 
 
 86
 Affirmed.
 
 
 
 [1]
 Hereinafter referred to as Ideal
 
 
 [2]
 A copy of the required release was enclosed with each of such letters
 
 
 [3]
 Rosenhan v. United States, 10 Cir., 131 F.2d 932, 934; Cohen v. United States, 8 Cir., 129 F.2d 733, 736; Simmons v. Peavy-Welsh Lumber Co., 5 Cir., 113 F.2d 812, 813; Foshee v. Daoust Const. Co., 7 Cir., 185 F.2d 23, 25; Mengel Co. v. Nashville Paper Prod. & Spec. Wrkrs. Union, 6 Cir., 221 F.2d 644, 647; 3 Ohlinger's Fed.Prac., 1964, p. 149
 
 
 [4]
 Securities and Exchange Commission v. Variable Annuity Life Insurance Co. of America, 359 U.S. 65, 69, 79 S.Ct. 618, 3 L.Ed.2d 640
 
 
 [5]
 Our construction of the phrase in the Endorsement, 'for each thousand dollars of life insurance issued on a paid-for basis and remaining in full force between May 1, 1948 and the end of the calendar year 1967,' (except certain insurance which the Endorsement stated should be excluded) to the effect that, in determining the 'insurance issued' on December 31, 1949, and on December 31 of each year thereafter, to and including 1967, there was to be included not only the insurance issued in the year for which the determination was being made, but all nonexcluded insurance issued theretofore, after May 1, 1948, if it was in force on a paid-for basis on December 31 of the year for which the determination was being made, is confirmed by the construction placed on such phrase by the insurer at the time it issued each policy bearing such Endorsement
 In a letter to the policyholder, which accompanied each policy when it was delivered, the insurer stated that 'for each $1,000 of Life Insurance' issued by it 'in the next twenty years' and also 'for each renewal premium' received by it 'on such insurance,' during the 20-year period, there would be deposited in the Bonus Fund not less than $1.00 nor more than $2.00.
 
 
 [6]
 See Utah Code Ann.1953, 31-13-1, et seq
 
 
 [7]
 They are so required by the laws of Utah. See Utah Code Ann.1953, 31-12-6 and 31-22-14