Fred A. MILLAR, Plaintiff,

v.

RELIASTAR LIFE INSURANCE COM-
PANY; Northwestern National Life
Insurance Company; Hagler & Asso-
ciates, Inc.; and William G. Hagler,
Clu, Defendants.

Civil No. 1:99CV205.

United States District Court,
W.D. North Carolina,
Asheville Division.

April 14, 2000.

, Joseph P. McGuire, Heather Whitaker
Goldstein, McGuire, Wood & Bissette,
P.A., Asheville, NC, for plaintiff.

Elizabeth N. Rich, Robert & Stevens,
P.A., Asheville, NC, Patrick A. Reinken,

Frank A. Taylor, Hinshaw & Culbertson, Minneapolis, MN, for defendants.

## MEMORANDUM AND ORDER STAYING PROCEEDINGS

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Plaintiff's timely filed objections to the Memorandum and Recommendation of U.S. Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendants' motion to compel arbitration and stay further proceedings to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review, the Court finds the motion should be allowed and the matter stayed until completion of the arbitration proceedings. **28 U.S.C. § 636(b); Fed.R.Civ.P. 72.**

## I.  FACTUAL FINDINGS

The following summary of facts correctly found by the Magistrate Judge in more detail and largely undisputed suffice to support the conclusions reached by this Court.

Plaintiff and Defendant Hagler had an ongoing business relationship of some years' duration involving life insurance coverage of Plaintiff. As a result of inquiries and response, Hagler provided Plaintiff with a Washington Square Securities, Inc. [WSSI] New Account Information Form. This form was required to be executed by a customer before a policy of the kind requested and received by Plaintiff could be issued. **Affidavit of Keith Loveland.** It was executed by Plaintiff and Defendant Hagler as registered representative on July 17, 1996. The name of the security/investment was set out as "Select Life III." **Exhibit A** *attached to* **Affidavit of Scott B. Paxton, filed November 30, 1999.**

In the box which Plaintiff's signature appears, the following language is set forth in readable type:

I represent that I have read and understood the terms and conditions governing this account and agree to be bound by such terms and conditions as currently in effect and as may be amended from time to time. *This account is governed by a pre-dispute arbitration agreement on the reverse side of this new account information form. I acknowledge receipt of the pre-dispute arbitration agreement.*

*Id.* **(emphasis added).** On the back of the same form, the following language appeared:

## PRE–DISPUTE ARBITRATION AGREEMENT

Your Account is subject to the arbitration rules of the National Association of Security Dealers, Inc. [NASD] Arbitration is used to resolve a dispute between two parties. Because controversies involving brokerage firms often involve complicated issues, arbitration forums were conceived by the [NASD] to provide an alternative dispute mechanism for investors which can be more efficient and less costly than court litigation. You should be aware of the following:

a.  Arbitration is final and binding on the parties.

b.  The parties are waiving their right to seek remedies in court including the right to a jury trial.

c.  Pre-arbitration discovery is generally more limited than and different from court proceedings.

d.  The arbitrators award is not required to include factual findings or legal reasoning and any parties right to appeal or seek modification of rul-

ings by the arbitrators is strictly limited;

e. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree that any disputes or controversies that may arise between myself and [WSSI] or a registered representative of [WSSI] concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened, shall be determined by arbitration before a panel of independent arbitrators set up by and in accordance with the rules and procedures of [NASD]. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

*Id.*, at **Exhibit B.** On October 15, 1996, the flexible premium variable life insurance policy was issued.

## II. DISCUSSION

■ Despite the clarity of the language in the instrument described above, Plaintiff contends that there was no pre-dispute contract to arbitrate. This conflicts with established federal and state precedent and preference.

Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: "[A] party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." Nevertheless, the Supreme Court has announced its "healthy regard for the federal policy favoring arbitration" and has explained that the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16[ ] "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at

hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitration."

*American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir.1996) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Thus, while the interpretation of the contract is done pursuant to state law, federal substantive law requires the Court to construe that contract in such a manner as to favor arbitration.

That is, the FAA [Federal Arbitration Act] "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," and that body of federal law requires that, "in applying general state-law principles of contract interpretation to the interpretation of an agreement within the scope of the Act, ... due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."

*McKee v. Home Buyers Warranty Corp. II*, 45 F.3d 981, 984 (5th Cir.1995) (quoting *Moses Cone*, 460 U.S. at 24, 103 S.Ct. 927, and *Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 475–76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

The Act applies to any "written agreement to 'arbitrate in ... a contract evidencing a transaction involving commerce'" and provides in § 2 that the agreement shall be " 'valid, irrevocable, and enforceable.' " *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 451 (4th

Cir.1997) (quoting *Moses Cone*, 460 U.S. at 24–27, 103 S.Ct. 927 (quoting 9 U.S.C. § 2)). This section of the Act manifests "Congress's 'liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'" *Id.*, at 451–52 (citations omitted). In fact, the Fourth Circuit has declared that the Act "preempts 'conflicting state laws which restrict the validity or enforceability of arbitration agreements.' This proscription, therefore, preempts state laws which either directly contradict federal law or obstruct the realization and execution of congressional objectives regarding the Act." *Id.*, at 452 (quoting *Saturn Distrib. Corp. v. Williams*, 905 F.2d 719, 722 (4th Cir. 1990)).

There is no need to consider preemption, however, since North Carolina is not in conflict with the Act or the policy. "North Carolina has a strong public policy favoring arbitration." *Red Springs Presbyterian Church v. Terminix Co. of North Carolina*, 119 N.C.App. 299, 303, 458 S.E.2d 270, 273 (1995).

■ Plaintiff denies there was a meeting of the minds of the parties in that he "did not believe that [he] was entering into any contract with any party;" that he "received no consideration … for filling out the Information Form;" and that he was only "considering" which, if any, life insurance policy to purchase. **Affidavit of Fred A. Millar, filed January 21, 2000.** Had Plaintiff taken the time to read the written agreement before signing, he would have understood its meaning. The wording was clear and unambiguous. "One who signs a written contract without reading it, when he can do so understandingly is bound thereby unless the failure to read is justified by some special circumstance." *Massey v. Duke University*, 130 N.C.App. 461, 465, 503 S.E.2d 155, 158

(1998) (citing *Davis v. Davis*, 256 N.C. 468, 472, 124 S.E.2d 130, 133 (1962)). No special circumstance is shown or suggested.

■ Nor does Plaintiff's claim of failure of consideration comport with North Carolina law.

[T]he agreement to arbitrate does not fail for lack of consideration. Mutual binding promises provide adequate consideration to support a contract. Where each party agrees to be bound by an arbitration agreement, there is sufficient consideration to uphold the agreement.

*Martin v. Vance*, 133 N.C.App. 116, 121, 514 S.E.2d 306, 310 (1999) (citations omitted); *see also, Johnson v. Circuit City Stores*, 148 F.3d 373, 378 (4th Cir.1998).

Plaintiff next contends that even though a binding pre-dispute contract be found, the dispute here involved is "not within the scope of the arbitration provision." Plaintiff's Brief in Opposition to Defendants' Motion, filed December 14, 1999.

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is construction of the contract language itself or an allegation of wavier, delay, or like defense to arbitrability."

*Carteret County v. United Contractors of Kinston, Inc.*, 120 N.C.App. 336, 342–43, 462 S.E.2d 816, 821 (1995) (quoting *Moses Cone*, 460 U.S. at 24–25, 103 S.Ct. 927). *See also, United Steelworkers, supra* ("**as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.**").

■ The pre-dispute Arbitration Agreement as set forth above defines the scope of the agreement as follows:

[A]ny disputes or controversies that may arise between myself and Washington Square Securities, Inc. or a registered

representative of Washington Square Securities, Inc. concerning any ... transaction, or ... performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened, shall be determined by arbitration ... in accordance with the rules and procedures of National Association of Security Dealers, Inc.

**Exhibit B,** *attached to* **Paxton Affidavit.** The quoted language leaves nothing to the imagination and is clearly intended to be broad and inclusive in scope. "When the language of the contract is clear and unambiguous, the court must interpret the contract as written." *Routh v. Snap–On Tools Corp.*, 108 N.C.App. 268, 273, 423 S.E.2d 791, 795 (1992).

Plaintiff's contention that Hagler was not acting as the registered representative of WSSI at the time the agreement was executed is also without merit. The face of the agreement itself refers to Hagler as the WSSI registered representative and is signed by him in that capacity. **Exhibit A,** *attached to* **Paxton Affidavit.**

█ Lastly, Plaintiff contends that his claims are not arbitrable under the NASD Code of Arbitration. The Magistrate Judge is correct in concluding that the variable life insurance policy involved in this dispute is arbitrable under the NASD Code which provides "for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association ... with the exception of disputes involving the insurance business of any members which is also an insurance company." **Memorandum and Recommendation, at 10 (quoting NASD January 1999 Manual 7511).** The insurance exclusion does not apply in this case.

The terms of the flexible premium variable life insurance policy are set forth in the April 30, 1996, Prospectus of the Northwestern National Life Insurance Company. **Exhibit C,** *attached to* **Paxton Affidavit.** This prospectus clearly indicates the securities nature of the instrument being offered and thus its inclusion under the Securities Act. *Securities & Exchange Comm'n v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 71–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). *See also, Securities & Exchange Comm'n v. United Benefit Life Ins. Co.*, 387 U.S. 202, 210–12, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (addressing flexible fund annuities).

Plaintiff relies heavily on the decision in *Prudential Sec. Inc. v. Emerson*, 905 F.Supp. 1038, 1046 (M.D.Fla.1995), in support of his contention that the present controversy is not subject to NASD arbitration. The *Emerson* decision, however, is easily distinguishable; and in any event, is not controlling in this case.

## III.  ORDER

**IT IS, THEREFORE, ORDERED** that Defendant Hagler's motion to compel arbitration is **ALLOWED,** and arbitration shall proceed before a panel of independent arbitrators established by and in accordance with the rules and procedures of the National Association of Security Dealers, Inc., as provided in the pre-dispute arbitration agreement.

**IT IS FURTHER ORDERED** that the corporate Defendants' motion to stay further proceedings against them in this action is **ALLOWED,** and this action is stayed to and including June 1, 2000, or until the completion of arbitration, whichever occurs earlier; and

**IT IS FURTHER ORDERED** that the parties to this action shall provide the Court with monthly reports concerning the progress of such proceedings.

## MEMORANDUM AND RECOMMENDATION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendants' Motion to Compel Arbitration and to Stay Further Proceedings. The undersigned has considered defendants' motion and brief, plaintiff's response, defendants' reply, and the arguments of respective counsel presented at a hearing. Prior to the hearing, the court posed five questions to be addressed at the hearing:

(1) what, if any, consideration was given by defendants in exchange for plaintiff's purported agreement to arbitrate;

(2) whether a "New Account Information Form" is an agreement;

(3) if such was a binding agreement, whether the purchase of a variable life insurance policy rather than another type of security was beyond the scope of the agreement;

(4) whether a variable life insurance policy is capable of being arbitrated under the Code of Arbitration Procedure of the National Association of Securities Dealers ("NASD") (an expert opinion from the NASD would be helpful); and

(5) although not binding, why this court should depart from the persuasive reasoning of the district court in *Prudential Sec., Inc. v. Emerson*, 905 F.Supp. 1038 (M.D.Fla.1995), *reh'g denied*, 919 F.Supp. 415 (M.D.Fla.1996).

Having considered all the arguments, the undersigned enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Background

The following facts are drawn from the allegations of the complaint, exhibits attached thereto, and other pertinent documents filed in support of and in opposition to the pending motion.

On July 5, 1994, plaintiff purchased a flexible premium adjustable life insurance policy, with a basic initial face amount of $600,000, which was issued by Liberty Life Insurance Company ("Liberty Life"). Plaintiff funded that policy through premiums payments totaling $10,600 per annum. On several occasions in 1996, defendant William G. Hagler, CLU, traveled from Greenville, South Carolina, to plaintiff's place of business to provide advice relating to plaintiff's life insurance coverage. Defendant Hagler and plaintiff had a continuing business relationship in that Defendant Hagler had sold plaintiff a number of life insurance policies over the years. It is plaintiff's allegation that the relationship developed into one where Defendant Hagler was a fiduciary, who was required to act honestly, in good faith, and in the best interests of plaintiff. Plaintiff, who was 55 years old in 1996, alleges that he told Defendant Hagler that any new policy plaintiff would purchase would have to have the following features:

(1) no premiums after the age of 65; and

(2) a death benefit of $600,000.

According to plaintiff, Defendant Hagler represented to him in June 1996 that defendant Northwestern National Life Insurance Company ("Northwestern") offered a variable life insurance policy with annual premiums of $10,600 and a death benefit of $600,000. On June 27, 1996, Defendant Hagler presented to plaintiff a written proposal featuring the Northwestern policy. Assuming a hypothetical 12 percent rate of return and maximum guaranteed costs, plaintiff alleges that with an initial rollover premium of $26,776 and annual premium payments of $10,600 through age 64, he anticipated a $600,000 death benefit fund-

ed until some date between the ages of 74 and 84, and, at current costs, through the age of 94, with a cash surrender value $1,264,266 at the age of 94.

According to plaintiff, Defendant Hagler presented a comparison statement, showing that his Liberty Life policy would cost more and be greatly outperformed by the proposed Northwestern policy. It is plaintiff's contention that Defendant Hagler misrepresented the comparative performance of the policies by using significantly different rates of return. Further, plaintiff alleges that Defendant Hagler represented to plaintiff that he was to obtain the Northwestern policy at a special rate, *i.e.*, that he would receive the nonsmoker rate, even though he was a smoker.

After several months, plaintiff accepted Defendant Hagler's proposal and submitted an application for the Northwestern policy. *See* Exhibit D to Complaint. This "Application for Life Insurance" appears to be on a form issued by Northwestern and purportedly signed on July 17, 1996.

Plaintiff alleges that upon his inquiry of Defendant Hagler as whether any terms or benefits of the policy had changed since the proposal, Defendant Hagler responded that none had changed. Upon such representation, plaintiff contends, he signed the application. He also contends that he asked for an updated policy illustration, which Defendant Hagler did not provide. On October 3, 1996, plaintiff gave Defendant Hagler a check for $2,650, made payable to Northwestern; that check was negotiated thereafter; and on October 15, 1996, Northwestern issued the policy.

Plaintiff contends that when he received the policy, it provided for a premium of $2,950 rather than $2,650. Further, he alleges that when he finally received an updated proposal in December 1996, it still was not in accordance with the terms and provisions of the proposal presented earlier by Defendant Hagler and was not received until after the period contractually allowed for recission. Rather than pay the greater premiums specified by the policy, plaintiff paid only the premium amounts illustrated by the June 1996 proposal, which has allegedly resulted in diminished performance of the policy.

In is plaintiff's contention that the policy received was not in conformity with the June 1996 proposal and that he will be required, over the life of the policy, to pay additional premiums in excess of $75,000 to ensure performance in conformity with the proposal. Plaintiff has alleged claims for (1) breach of fiduciary duty; (2) professional negligence; (3) negligent misrepresentation; (4) constructive fraud; and (5) unfair and deceptive trade practices.

In moving to compel arbitration, Defendant Hagler states that plaintiff signed a pre-dispute arbitration agreement. The corporate defendants have moved to stay this action pending arbitration of the claims between Defendant Hagler and plaintiff.[1] In support of his argument, Defendant Hagler has submitted a Washington Square Securities, Inc. ("Washington Square") "New Account Information Form," which appears to have been signed by plaintiff on the same date as the Northwestern "Application for Life Insurance," discussed above. On the back of the "New Account Information Form" is a standard arbitration agreement, which provides, in relevant part, as follows:

---

1. Without doubt, the request for stay is most appropriate, for if the dispute between Defendant Hagler and plaintiff is remanded to arbitration, it would be a waste of judicial and litigant resources to actively pursue this action, inasmuch as resolution of the claims between the plaintiff and Defendant Hagler is central to resolution of this case.

I agree that any disputes or controversies that may arise between myself and . . . a registered representative of Washington 'Square Securities concerning . . . any . . . agreement between us, whether entered into before, on or after the date this account is opened, shall be determined by arbitration . . . .

Paxton Aff., Exhibits A & B. In small block letters on the front of the "New Account Information Form," and directly above plaintiff's signature, is a line that provides, as follows:

I REPRESENT THAT I HAVE READ AND UNDERSTOOD THE TERMS AND CONDITIONS GOVERNING THIS ACCOUNT AND AGREE TO BE BOUND BY SUCH TERMS AND CONDITIONS AS CURRENTLY IN EFFECT AND AS MAY BE AMENDED FROM TIME TO TIME. THIS ACCOUNT IS GOVERNED BY A PRE–DISPUTE ARBITRATION AGREEMENT IN THE REVERSE SIDE OF THIS NEW ACCOUNT INFORMATION FORM. I ACKNOWLEDGE RECEIPT OF THE PRE–DISPUTE ARBITRATION AGREEMENT.

The court can think of no good motive for the back-of-the-form location of the agreement and the minute size of the acknowledgment on the front of the form created by Washington Square and supplied by Defendant Hagler. Further, the caption of such document would give reasonable persons little notice that they are irrevocably foregoing their rights to access the courts in the first instance. Even so, such inequities are not dispositive of the substantive issues under current case law discussed below.

Defendant Hagler contends that he is a registered representative of Washington Square and that the Northwestern policy purchased by plaintiff was a product being offered through such agency. It is Defendant Hagler's argument that the arbitration provision contained in the "New Account Information Form" is a binding and enforceable agreement and must be enforced according to its terms, as required by 9, United States Code, Sections 1–14. Determining whether that agreement is enforceable against plaintiff involves traditional considerations of the law of contracts. *Id.,* at Section 2. Plaintiff contends that arbitration should not be ordered because (1) the claims presented herein are not within the scope or contemplation of the arbitration agreement; (2) the NASD Code of Arbitration Procedure excepts these claims as "insurance disputes"; and (3) the arbitration/litigation proposed by defendants will not result in the "just, speedy, and inexpensive determination" of this action.

## II. Discussion

In the context of an arms-length transaction, this court does not hesitate to enforce a bargained-for arbitration agreement. Indeed, prompt court enforcement of arbitration agreements is the linchpin of Title 9, United States Code, Section 2.

Although the arbitrability of disputes is governed by Title 9, the initial question for this court is whether the arbitration provision asserted by Defendant Hagler is part of a contract. Section 2 of Title 9 governs the effect of a "contractually agreed-upon arbitration provision," but state law prevails on general principles concerning contract formation. *Supak & Sons Mfg. Co., Inc. v. Pervel Indus. Inc.,* 593 F.2d 135 (4th Cir.1979). In the 20 years since *Supak,* both the United States Supreme Court and the Court of Appeals for the Fourth Circuit have indicated a strong preference for arbitration:

Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: "[A] party cannot be required to

submit to arbitration any dispute which it has not agreed so to submit." Nevertheless, the Supreme Court has announced its "Healthy regard for the federal policy favoring arbitration" and has explained that the Federal Arbitration Act ... "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

*American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir.1996) (*quoting United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Interpretation of the contract is governed by state law, and federal law requires that ambiguities or doubts in a contract be construed in favor of arbitration. *McKee v. Home Buyers Warranty Corp. II*, 45 F.3d 981, 984 (5th Cir.1995).

The first issue is whether the "New Account Information Form" is a contract. It is clear from a review of North Carolina substantive law that it takes very little to create a valid arbitration contract. In *Howard v. Oakwood Homes Corp.*, 134 N.C.App. 116, 516 S.E.2d 879 (1999), the North Carolina Court of Appeals held, as follows:

- We note at the outset that North Carolina " 'has a strong public policy favoring the settlement of disputes by arbitration' ", and that "[o]ur Supreme Court has held that where there is any doubt concerning the existence of an arbitration agreement, it should be resolved in favor of arbitration." *Martin*

*v. Vance*, 133 N.C.App. 116, 514 S.E.2d 306, 309 (1999) (citing *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 91–92, 414 S.E.2d 30, 32 (1992)). Although arbitration is favored in the law, in order to be enforced, the underlying agreement must first be shown to be valid as determined by a common law contract analysis. *Routh v. Snap–On Tools Corp.*, 108 N.C.App. 268, 423 S.E.2d 791 (1992). It is a basic principle of contract law that in order to be valid, an agreement must be supported by adequate consideration. *Deans v. Layton*, 89 N.C.App. 358, 368, 366 S.E.2d 560, 567, *disc. review denied*, 322 N.C. 834, 371 S.E.2d 276 (1988) (citation omitted). "Mutual promises may constitute reciprocal consideration to support a contract." Id.

In *Vance, supra*, this Court recently ruled on the validity of an agreement to arbitrate in the employment context.

\*    \*    \*    \*    \*    \*

In holding that the agreement was supported by adequate consideration, this Court stated,

> ... the agreement to arbitrate does not fail for lack of consideration. Mutual binding promises provide adequate consideration to support a contract. Where each party agrees to be bound by an arbitration agreement, there is sufficient consideration to uphold the agreement.

*Vance* at 121, 514 S.E.2d at 310 (citations omitted). The *Vance* court noted that other jurisdictions have held that mutual promises to arbitrate constitute sufficient consideration, specifically citing the Fourth Circuit opinions in *O'Neil v. Hilton Head Hospital*, 115 F.3d 272 (4th Cir.1997), and *Johnson v. Circuit City Stores*, 148 F.3d 373 (4th Cir.1998). We too find such cases instructive.

In *Johnson*, the Fourth Circuit reversed the district court's conclusion that an arbitration agreement was void for lack of consideration, and held that an agreement between the parties to be bound by the same rules was sufficient consideration to support the arbitration agreement. *Johnson* at 378. The court stated,

> As in *O'Neil*, both parties in this case agreed to be bound by the arbitration process for the resolution of any claim required to be submitted to arbitration under the Dispute Resolution Agreement. Therefore, we hold that the Dispute Resolution Agreement was supported by adequate consideration .... no consideration above and beyond the agreement to be bound by the arbitration process was required.

The Vance court, upon noting that the plaintiff had actually signed the contract, the terms of which unambiguously bound her to arbitration, held it unnecessary to look beyond the writing to determine if mutual assent existed. Id. *Id.*, 516 S.E.2d at 881–82. The "New Account Information Form" contains mutual promises to be bound by the arbitration agreement, which, as a matter of law, amounts to sufficient consideration to "uphold the agreement." *Vance, supra.*

It having been found that a contract exists, the next issue is who may assert the rights and privileges of such contract. Plaintiff clearly signed the agreement and is bound by its terms. Review of Exhibit A of the affidavit of Scott B. Paxton reveals that Defendant Hagler signed the form in his capacity as a representative of Washington Square (on apparently the same day that plaintiff signed), and that it was later signed as "approved" on October 17, 1996, by a person at the Washington Square "home office." The terms of the agreement provide for arbitration of disputes between plaintiff and Washington Square and any "registered representative of Washington Square" that concern "any order or transaction ... or any other *agreement between us.*" Paxton Aff., Exhibit B (emphasis added).

The issue becomes whether Defendant Hagler can invoke the arbitration provisions of the Washington Square agreement. In *Arrants v. Buck,* 130 F.3d 636 (4th Cir.1997), the Court of Appeals for the Fourth Circuit dealt with an almost identical issue. The plaintiffs in *Arrants* brought a securities fraud action against the introducing broker (Wolf) and the clearing broker (Prudential). Wolf moved to compel arbitration based upon plaintiffs' agreement with Prudential, which was contained in a new account information form. As the introducing broker, Wolf solicited the account with the plaintiffs, made investment recommendations, and accepted orders. Prudential, as clearing broker, performed cashiering and processing functions, kept the books, and prepared confirmations and statements, sending them to the customers.

After the plaintiffs agreed to open accounts, Wolf sent them forms for signature, explaining that they were needed to support plaintiffs' accounts with Wolf. While Prudential's name appeared on the forms in bold letters, the name of the introducing brokerage, F.N. Wolf, appeared nowhere on the forms. Prudential later sent plaintiffs a letter advising that it was not their broker, only a clearing firm that did the back office work for their broker. Not unlike the language in the agreement *sub jus*, the plaintiffs' agreement with Prudential contained an arbitration agreement calling for arbitration of "all controversies which may arise between us ...." *Id.,* at 639. The *Arrants* court held, as follows:

Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate. Courts decide whether there is an agreement to arbitrate according to common law principles of contract law.

In the case before us, there is no question that the arbitration clause would be valid and enforceable as between the customers and Prudential, the clearing broker. Indeed, Prudential's reason for requiring an arbitration provision is obvious: clearing brokers are vulnerable to suit. Thus, Prudential followed the common industry practice of requiring the customers to sign a client agreement directly with it.

Of course, Prudential has not been sued here, so it does not seek arbitration. Instead, it is the introducing broker, F.N. Wolf, and its employees ... who have argued that the customers were bound to arbitrate with them under the Prudential agreement.

\* \* \* \* \* \*

For the most part federal courts have rejected attempts by introducing brokers to invoke arbitration clauses in agreements between their customers and clearing brokers.

*An introducing broker has been permitted to invoke the arbitration provision in a customer clearing broker agreement only in two situation that rarely occur: when the introducing broker is the agent of the clearing broker* or when the introducing broker is a third-party beneficiary to the agreement.

*Id.,* at 640–41 (citations omitted; emphasis added). Can Defendant Hagler, as the introducing broker herein, invoke arbitration under the Washington Square agreement? Under the reasoning of *Arrants,* the answer appears to be, "Yes." The form indicates that Defendant Hagler signed as the "registered representative" of Wash-

ington Square and that the terms of the arbitration agreement provide that it is applicable to disputes between plaintiff, Washington Square or "a registered representative" of Washington Square.

Assuming that Defendant Hagler can be the registered agent of more than one clearing firm, the final question is whether the product at issue—the "Select Life III" policy issued by Northwestern—was an order or transaction involving Washington Square. On page 3 of the "Policy Proposal Using Select*Life III," which was submitted by Defendant Hagler to plaintiff on June 27, 1996, the following language appears:

> ISSUER. Select*Life III is a product of Northwestern National Life Insurance Company ... and distributed through Washington Square Securities, Inc.

Complaint, Exhibit A. The court, therefore, must conclude that plaintiff's purchase of the Select*Life III policy involved an "order or transaction" between plaintiff, Washington Square, and Defendant Hagler, as the registered agent of Washington Square, that is subject to arbitration.

The next issue raised by plaintiff is whether sending this matter to arbitration is contrary to the provisions of the arbitration agreement and, ultimately, an exercise in futility. Plaintiff contends that the NASD's rules of arbitration specifically except from arbitration disputes involving insurance contracts. The court has reviewed carefully the April 30, 1996, Select*Life III prospectus and finds relevant page 10 thereof, which provides:

**How does the Policy compare to traditional life insurance?**

Like traditional life insurance:

— The Policy provides a guaranteed minimum amount of life insurance coverage.

-As long as you meet the requirements for the Death Benefit Guarantee, your policy will remain in force during the Death Benefit Guarantee Period;

-You can surrender the Policy while the Insured is living and receive its Cash Surrender Value;

-The Policy has a loan value.

-The Fixed Accumulation Value is guaranteed.

Unlike traditional life insurance:

-You choose where the Net Premiums for the Policy are invested.

-You may transfer existing values among the investment options.

-The Variable Accumulation Value may increase or decrease based on the investment performance of the Funds you select.

-You choose between two Death benefit Options.

-You choose the amount and frequency of your premium payments.

-After the second Policy Year, you can increase or decrease the face Amount.

Paxton Aff., Exhibit C, at 10. The court finds it reasonable to conclude that the Select*Life III policy purchased by plaintiff is a "hybrid," in that it is a life insurance policy having investment features. The prospectus further provides that the insured can direct investments in the variable account into 17 funds, each with varying investment objectives.

The agreement in this case specifies arbitration before "a panel of independent arbitrators set up by and in accordance with the rules and procedures of National Association of Security Dealers, Inc." Section 1 of the NASD Code, "Matters Eligible for Submission," provides, as follows:

[The Code is prescribed] for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association ... with the exception of disputes involving the insurance business of any members which is also an insurance company.

See NASD January 1999 Manual 7511. No doubt, a transaction involving the sale of traditional life insurance would not be eligible for arbitration under the NASD Code. *Weinstein v. The Equitable Life Assurance Soc'y*, 1996 WL 557321, at 2 (E.D.Pa.1996).

The undersigned will now turn to reported case law to determine whether a dispute involving the purchase of a variable life insurance policy is subject to NASD arbitration. In *Prudential Securities, Inc. v. Emerson*, 905 F.Supp. 1038, 1046 (M.D.Fla.1995), *reh'g denied*, 919 F.Supp. 415 (M.D.Fla.1996), the district court was presented with a motion to set aside the decision of a NASD arbitration panel where the customers voluntarily submitted their dispute to NASD arbitration and received a favorable decision. Among the instruments at issue were variable life insurance policies. In vacating the award of the arbitrator, the district court found that "the claims regarding those policies are not arbitrable according to ... the NASD Code of Arbitration Procedure which excludes from arbitration those claims involving insurance which are brought against an insurance company." *Id.*, at 1046.

Defendant Hagler argues in rebuttal that variable annuity contracts have long been held to be securities because the benefits fluctuated with the fortunes of the investment fund. *Securities and Exchange Commission v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 71–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). He further argues that such policy was registered and sold by means of a prospectus, as required under federal securities law,

and disclosed therein that the product was a security. Paxton Aff., Exhibit C, at 1. Defendant Hagler distinguishes the policy in *Emerson* on many grounds, the most compelling of which is that the district court treated the policies as insurance.

The face of the prospectus provides that the product is a "variable life insurance policy," while the text of the prospectus makes clear that what is being offered is a registered security. While the *Emerson* case is persuasive authority, it is distinguishable on a crucial fact—the district court considered the variable life policies at issue there to be policies of insurance. The undersigned, however, must find that the holdings of the Supreme Court, when read together, dictate a result different than that reached in *Emerson:*

(1) the *Securities and Exchange Commission* Court's holding that similar financial instruments, involving both beating the life expectancy tables and the fortunes of the investment funds, were securities; and

(2) the Court's conclusion in *Moses H. Cone Memorial Hospital* "that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

While no party took up the gauntlet of providing an expert affidavit on whether the NASD would accept this matter for litigation, it now falls to the court to make such call. The undersigned cannot discern what NASD will or will not do, or even make an educated guess, because it does not appear that its decisions are governed by *stari decisis* or, for that matter, reported.

The undersigned finds that the great weight of current federal case law counsels erring on the side of arbitration. This court cannot find, as a matter of either law or fact, that this particular dispute is barred by the NASD's rules of procedure. Plaintiff, however, has made a strong argument that his claims are not subject to arbitration, and he should present that argument to the arbitration panel in the first instance. If the panel agrees, he will quickly be back in this forum. The undersigned, therefore, will recommend that Defendant Hagler's Motion to Compel Arbitration be allowed and that the corporate defendants' corresponding Motion to Stay Proceedings be allowed in the interests of justice. While plaintiff has argued that arbitration would defeat Rule 1, Federal Rules of Civil Procedure, because simultaneous litigation and arbitration would be expensive and duplicative, the undersigned finds that a stay of the non-arbitrable claims against the corporate defendants would be appropriate, inasmuch as arbitration has the potential at least to resolve the bulk of plaintiff's claims.

### RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that

(1) Defendant Hagler's Motion to Compel Arbitration be **ALLOWED** and plaintiff's claims asserted against such defendant be **REMANDED** to arbitration;

(2) the corporate defendants' Motion to Stay Further Proceedings be **ALLOWED** and this action be **STAYED** under the following conditions:

(a) this action be stayed until June 1, 2000, or until completion of arbitration, whichever is earlier; and

(b) the parties be required to provide the court with monthly status reports concerning the progress of such proceedings.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendants' Motion to Compel Arbitration and to Stay Further Proceedings (# 15).